ELLIS HALL v. STATE.

No. A-9545. Sept. 15, 1939.

(93 P. 2d 1107.)

Steele & Boatman, and Joe S. Eaton, all of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The defendant, Ellis Hall, was by information in the district court of Okmulgee county, Okla., charged with the offense of attempting to rape and ravish one Billie Ruth Jernigan, a female of about 14 years of age. He was tried, convicted, and his punishment fixed at seven and one-half years in the state penitentiary.

The defendant filed a motion for a new trial, which motion was by the court considered, overruled, and the defendant has appealed.

The testimony introduced by the state, in substance, is as follows: That the defendant resided in the 900 block of North Collins street in the city of Okmulgee in the summer, fall, and winter of 1937. The members of his family consisted of his wife and his mother. He had resided at the same place since August, 1935. The prosecutrix, Billie Ruth Jernigan, lived with her parents just across the street from the defendant, at 916 North Collins. Billie Ruth Jernigan, the prosecutrix, was at the date of the alleged offense under the age of 14 years. The offense is alleged to have been committed on or about the 20th day of August, 1937. Billie Ruth Jernigan had a sister by the name of Joy Lynn Jernigan, who was 12 years of age at the time of the alleged offense. Joy also lived at 916 North Collins with her parents. Bettie Sue Pierce also resided in the same neighborhood with the defendant and the Jernigan girls. Bettie Sue Pierce lived with her par-

ents next door to the defendant and his wife. Bettie Sue Pierce was 11 years old.

The testimony further shows that all of the girls named herein played together in the neighborhood, and all attended the public schools of Okmulgee; that they often went to the home of the defendant and his wife. The two Jernigan girls often assisted the wife of the defendant in doing her household work; that all of these girls used the typewriter of the defendant, and often played the piano at his home. The defendant was employed as a linotype operator at the Times Building Company at Okmulgee, and worked at nights, sleeping in the forenoon of the daytime in the room directly across the hall from the living room.

The prosecutrix, Billie Ruth Jernigan, in her testimony, in substance, states that on or about the day or date alleged and set forth in the information:

"I was called to the home of the defendant to assist his wife in doing her household work; that about noon on said date the defendant's wife told me to go into the room of the defendant, and call him. I entered the room of the defendant, who was asleep, and woke him up, and told him Mrs. Hall wanted him to get up. The defendant requested me to sit down on his bed. At that time the defendant was in bed, under the cover, and was dressed in his underclothes. The defendant pulled me down on the bed, putting his right arm around my neck. The defendant then removed his right arm, and succeeded in pulling my slacks and underclothes down to my knees. He then fingered me. He had his private parts out. I raised my knees, striking said defendant; and he rolled away from me. I immediately left his room and went home; that time Mrs. Hall was there in the house, and also Mr. Hall. I don't know whether Mrs. Hall, mother of the said defendant, was at home or not. I did not tell Mrs. Hall, his wife, or any one else about my experience with the defendant until on or about the 31st day of December, 1937. I first told Bettie Sue Pierce. I did not go back and make any statement to Mrs. Hall. I didn't tell my mother about what had hap-

pened. I had another experience with him, which was about two weeks after Mrs. Hall had had an operation. I went over to the house; and she tried to get me to go into his bedroom; and I didn't go. I don't know when it was that Mrs. Hall had an operation. It was after the other experience that I have stated, about three or four months. I went to the carnival one night with Mr. and Mrs. Hall; went in their car. As we left the carnival we went out to some lady's house to see about getting some cream. We got out and went in. When we got back to Mr. Hall's place, Mrs. Hall said she would get out and feed the dog, and Mr. Hall and I stayed in the car. Mr. Hall asked me if I would do it then; and I told him, 'No.' He pulled down my pants; and I opened the door, and got out, and went home. He did not try to kiss me, or make love to me in any other way when he had me on the bed that day; just put his arms around me."

On cross-examination the witness was asked if she had testified at the preliminary trial; and she answered she had.

"Q. And what do you say he did? And you said, 'He put his hand up my dress?' Is that right? A. Yes, sir. Q. And then following that I want to ask you if you were not asked by me, 'What did you say?'; and you answered, 'Nothing.' Do you recall that? A. No, sir. Q. Then I want to ask you if you didn't, in giving your testimony to the question, 'After that how long did you wait in the car?'; and you said, 'Just a few minutes.' Don't you remember that? A. Yes, sir. Q. Did I ask you who got out of the car first, and you said, 'I did?' Then you were asked if he tried to prevent you from getting out of the car; and you said, 'No.' And I will ask you if this question was not asked, 'And he took hold of you and just put his hands up your dress?'; and you said, 'Yes, sir.' And following that I asked you this question, 'Neither one said anything?' Do you remember me asking you that? A. Yes, sir. Q. And you said, 'No, sir, neither said anything.' A. Yes, sir. Q. And this is the first time you have told about him asking you if you would do it? Is that right? A. Yes, sir. I was thinking it over the other night, and he did say it. I am mistaken on both these times when I said neither one of us said anything. Q. Mr. Hall works down at the Times Building Company? A. Yes, sir. Q. And he sleeps mornings? A. Yes, sir. Q. I believe there are six rooms in the

house, and a back porch. On the south side is three bedrooms in a row, including that on the back porch, with a bathroom between the front and back rooms? A. Yes, sir."

The witness continued:

"Mr. Hall was in the front bedroom, the one opening off the living room. When I came out of the kitchen, I went through the dining room and living room, and into the front bedroom. There is no door between the dining room and the kitchen; and none between the living room and the dining room. There is a door between the living room and the bedroom, in which the defendant was sleeping. When I went to call him, as requested by Mrs. Hall, the door was closed. I didn't knock before I went into the room. Mr. Hall was asleep; and I called and told him to get up. When I called, I was over by the bedside. When he roused up, he said, 'Sit down on the edge of the bed.' He was under the cover at the time. He was on the opposite side of the bed from where I approached. When he told me to sit down, he rolled over and pulled me down on the bed. I didn't say anything. He put his arms around my neck. At that time I was already laying down. He then pulled my slacks down; he then pulled my pants down. Mr. Hall was dressed in his underwear. He did not have on pajamas. After he pulled my slacks and pants down, he lay down on me. Q. What did you do? A. Nothing. He next fingered me. He felt of me. I said nothing, and he said nothing. Q. Then what happened? A. I kicked him; just raised my knee up and kicked him with my knee. He just rolled over, back to where he was on the bed. I said nothing; I got up and went home."

The witness continued:

"I told my mother on the 31st day of December, 1937. I didn't say anything to Mrs. Hall about it. My conversation with Mrs. Hall about two weeks after she was operated on took place in the living room. Mr. and Mrs. Hall and I were in the house at the time. I don't know where Mr. Hall's mother was. Mrs. Hall, the wife of the defendant, asked me to go in there; and I told her 'No.' She kept asking me to go in Hall's bedroom. Mrs. Hall, the defendant's wife, said she wanted me to go in there, because she had not been able to do it with him. This is the first time that I have told about that conversation. Mrs. Hall

tried about three times to get me to go into the defendant's bedroom. These occurrences were after this first; I don't know just exactly how long. Mr. Hall usually got up about 11 o'clock, and these other two occurrences were sometime before he got up. I don't know where his mother was when his wife asked me to go into his room.

"At the preliminary hearing, I testified that he put his hand up under my dress when we were in front of the house in the car. I went into Mr. Hall's house to play the piano, and sometimes to use the typewriter; and up until this complaint was made, I was in and out of his house. I worked for Mrs. Hall about once or twice every week. She first talked to me about going into the room where the defendant was about two weeks after her operation. It was just before Christmas when I told the little Pierce girl what had happened. The Pierce girl lived next door to Mr. Hall. I go over to the Pierces' sometimes and take care of the small children. I had not been to the Hall home for quite awhile before Christmas. I told the Pierce girl about what had happened, one time when I was over at the Pierce home assisting in taking care of the little children, which was just before Christmas. After I told the Pierce girl, the Pierce girl and I told the boys; I just told them what he had done. They got pretty sore about it, and said they were going to get Mr. Hall. We went into the house; and they went around the corner of the house, and that is the last we saw of them. They came to the back door later on. I later learned they had been over to Mr. Hall's house, and talked to him. Later I told my mother, on the 31st day of December. Bettie Sue Pierce was with me. I told my mother that Mr. Hall had mistreated us."

On redirect examination:

"At the time I testified in the preliminary examination, I had never been on the witness stand. I had never been in court. I was a little bit nervous. The boys that Mr. Boatright asked me about were Jack Swafford and Kenneth Biggins. I told the boys about the 29th, two days before I told my mother."

On re-cross-examination:

"On the Wednesday before, I believe, I told the two boys on Friday, I think it was, I recall that I went over to

the Halls' in the morning and wanted to play the piano, and Mrs. Hall told me Mr. Hall was asleep; and on the same evening I went back, and Mr. Hall came to the door, and said Mrs. Hall was fixing to have a party, and I couldn't come in then. Q. And you didn't like that very much, did you? A. No, sir."

Joy Lynn Jernigan, testifying for the state, stated:

"I am a sister of Billie Ruth. I am 12 years of age; will be 13 on March 29th. I know the Hall family. I have lived out there, neighbors with them, and have been at their house frequently. The last time I visited in their home was about a week before vacation started at the school."

Over the objections of the defendant, the court permitted the witness to testify that she was at the defendan's home at one time when Mrs. Hall went to the store, and that the defendant tried to stick it in her, and she jerked away, and went home. "He had my pants down. It was in the front bedroom."

The witness was cross-examined by counsel for the defendant; but the cross-examination did not elucidate anything further than what is stated herein.

At the close of the witness' testimony, the defendant moved to exclude the same from the jury. The court overruled the motion; and defendant reserved an exception.

Bettie Sue Pierce was next called as a witness, and stated:

"I live at 915 North Collins, next door to the defendant Ellis Hall; have lived there since the summer of 1937. I am 11 years old."

Counsel for the state asked the witness:

"Q. Did you have a little experience there with Mr. Hall along in the early part of the fall? A. Yes, sir."

Counsel for the defendant objected to the witness' testimony on the ground that it was incompetent, irrele-

vant, and immaterial; and inadmissible in this case for any purpose, and not in support of any issue in the information; which motion was denied and exceptions saved.

"I was playing in the yard with my brother and sister and a little child; and he had his dog on the front porch. He was a Japanese dog, and quite cute, and I went to pet the dog. While I was there Mr. Hall said, 'If you will come in the house, he will play ball with us'; and told me to send my little brothers and sisters home. He asked me if I knew how to work a cross-word puzzle, and I told him I did not. He pushed me down on the couch, and tried to pull my pants down, and I kicked so hard that he could not. I would have screamed, but I had a lump in my throat. He began to unbutton his pants; and there was a knock at the door, and my little brother said, 'Is Sue here?'; and he said, 'Yes'; and I left."

This testimony was admitted over the objection of the defendant; and at the close of this testimony a motion was made to exclude the same from the jury on the grounds that it was incompetent, irrelevant, and immaterial, which motion was overruled, and exceptions saved.

On cross-examination the witness, in substance, stated the same that she had on direct examination.

The witness testified to a conversation that took place between herself, Billie Ruth, Jack Swafford, and Kenneth Biggins, when the girls had told them what had taken place between them.

Jack Swafford was called by the state, and stated:

"I don't know whether or not I went to the home of the defendant on the 31st of December, last year, as I don't remember what day it was; but I remember of going over there. Kenneth Biggins went with me. We went there to talk with Mr. Hall. Q. And what did he say or do when you asked him about what happened? A. Well, he blushed and got white, and run in and got his hat, and left immediately. He said he didn't do anything of the kind."

On cross-examination the witness stated he was 13 years old, and that he went to school.

"I live across the street from the Hall home. I go to school with Billie Ruth and Joy Lynn; but with Bettie Sue, I do not. The girls told Kenneth Biggins and myself what they claim the defendant had done to them."

Considerable record is made examining the witness as to the Jernigan and Pierce families, and what took place between them; but all of it was in the absence of the defendant.

Jack Swafford continued:

"When we went to see Mr. Hall, I had my knife; and Kenneth had his."

Kenneth Biggins testified for the state, stating:

"I live at 910 North Collins, in Okmulgee. I go to school. I know Billie Ruth Jernigan and Mr. Hall. Jack Swafford and I had a conversation with Mr. Hall about the 31st day of December, last year, on his front porch at his home. We went over and told him we had heard something that he had done; and he said he had done nothing to the girls; and went in the house, and came back with his hat on, got in his car, and drove off. We went back to the Pierce house. Mrs. Hall was there; she heard the conversation we had with Mr. Hall. Mrs. Hall was standing at the front door."

On cross-examination the witness stated that he was 13 years old.

"Jack Swafford goes to the same school I do. He and I are together quite often; study together sometimes. I first heard of this incident through overhearing the girls talk."

Several pages of the record are taken up in the examination of the witness, much of which is immaterial, and does not tend to establish the guilt or innocence of the defendant.

At the close of the state's testimony, the defendant demurred to the testimony of the state on the grounds and for the reason that the same wholly fails to prove an offense as set forth in the information, or any other offense

against the laws of the state of Oklahoma, which motion was overruled, and the defendant excepted.

The defendant called the following witnesses, who testified as to his previous good character, and as to his being a law-abiding citizen: Paul Whitaker, Emmet Kyle, C. B. Pair, R. R. Baggot, W. M. Meek, and M. V. Richardson.

Also, the following ladies testified as to the good character of Mrs. Hall, the defendant's wife: Mrs. Lester Mowery, Mrs. C. B. Pair, and Mrs. M. V. Richardson. Some of these ladies testified as to both the character of the defendant and Mrs. Hall.

Mrs. Wilma Ellis Hall, called as a witness for the defendant, stated:

"My name is Wilma Ellis Hall. I am 71 years of age. In the summer of 1937, beginning in July and up until the 19th day of December, 1937, I was in Okmulgee, living with Ellis Hall. I am not very well acquainted in Okmulgee. In August, 1937, I was living at my son's home. I usually took a walk early in the morning, and after the sun had gone down; except one day during the fair in the fall, I was away until after noon awhile, but the other days I had been there at the noon hour. The day I was away, I was at the 4H Fair, out at the Fair Grounds. From about the 20th to the 25th of August, 1937, I was not absent from the place during the noon hour, or during the heat of the day. I am acquainted with the Jernigan girls. They came often to the house to visit, use the piano, and typewriter. My son's wife was away for a short while, but I remained at the home with him during her absence. During her absence, I told these girls that Ellis told me they damaged the keys of the typewriter, and I would rather they did not use it, in as nice a way as I knew how. The girls came in one time, and said his wife said they could use the large typewriter, and they wanted to. I did not raise any fuss or objection. As they came and went from the home, I did not observe anything unusual in Ellis' attitude towards them. They were coming in and out practically every day until I left on December 19, 1937. They would be there sometimes two or three times a

day and they might have stayed away as long as two or three days at a time. They continued to be in and out of the house all the time I remained there; but they did not come as often as they were in school. These girls worked for Mrs. Hall sometimes. Mrs. Hall underwent an appendicitis operation sometime in October. I do not remember the date. She was sick a few days before she left for the operation. I visited some in the Jernigan and Pierce homes during the summer. I went to the Missionary Society some in the afternoons when it was in that part of town. Occasionally after the noon hour, I would leave, after the heat of the day was past."

Mrs. Ellis Hall, wife of the defendant, testifying, stated:

"I live at 913 North Collins street, Okmulgee, Okla. I have lived there since August, 1935. I am the wife of the defendant. I know the Jernigan girls and the Pierce girl, who have testified in this case. They live out near where I live. I have never observed anything out of the way of my husband and these little girls. The reason I asked Billie Ruth to go with us to the Fair Grounds was that Mrs. Jernigan said that she would like for me to talk to Billie Ruth, as she had a boy friend going to college; and that she could not find out who he was, and that she would like for me to find out from Billie Ruth if possible. Billie Ruth wanted to go to the circus, and as we could not send the other girls, we did not send Billie Ruth. We drove out to Mrs. Stanger's on the Beggs highway, about two miles north of the Log Cabin. I buy cream from Mrs. Stanger. We came back, and drove up to our home, and stopped. My husband and I got out, and went in the house; and Billie Ruth remained in the car. When we came out, she was standing beside the car. My husband did not stay in the car after I got out, but went in the house; and we came back out together. I did not send Billie Ruth into my husband's bedroom on or about the 20th of August, 1937, to wake him up; nor did I try to get Billie Ruth to go into my husband's bedroom, and get in bed with him. I had no such conversation, or anything that would indicate such. I first heard about this trouble on Friday evening about 4:30. My husband was at home. We were in the house; the door bell rang, and I went to the door. Kenneth Biggins and Jack Swafford were at the door. They wanted to see Mr. Hall. I asked, 'What do you want?' And

they replied that they wanted to speak to him; and I called him to the door, and they talked. I did not hear at that time what was said. They went off, and he came back in; and I said, 'What did they want?' That is the first time that I heard about any complaint against my husband. My husband goes to work at about 4:45 in the afternoon; and these boys came back before he left, as he went out to get in the car. I heard that conversation. The Biggins boy said, 'Well, they still say it is true.' My husband said, 'I can't help it, it isn't.' My husband then went on to work. My husband always goes to work around 4:45 in the afternoon, and gets off at 9:30 for lunch, and goes back at 10:00, and works until 1:15. He sleeps in the mornings. He is never asleep as late as 4:15 in the afternoon. At no time did I leave the house, and leave my husband and the little Jernigan girl there. These Jernigan girls came back and forth to my house almost every day, and continued to do so up until the time that the boys I have mentioned in my statement came and asked Mr. Hall about what he had done to the girls. On one occasion the girls came, and the little Pierce girl opened the piano and started to play, and I asked them not to play, because Mr. Hall was asleep. That afternoon they came back. I was having a bridge party, and I asked them to wait. Neither of the girls at any time prior to the day the boys came to our home, and told Mr. Hall they had heard that he had been mistreating the girls, had ever said a word about what they insist had happened; nor did they cease to come back and forth to our home. They worked for me some, and I paid them for helping me. My husband's mother was with us from the 20th of July until the 20th of November. She was away for a little while, and came back and stayed until the 19th of December, 1937. During the summer, along around the 20th to 25th of August, my husband's mother was always present at the lunch hour, as she liked to have her meals regular. It is not true, as testified by the oldest Jernigan girl, that I at any time tried to get her to go in my husband's room and get in bed with him. I have never thought of such."

On cross-examination Mrs. Hall stated that she would get the girls to help her with her work; that Mr. Hall's mother was there all the time.

"If she left the house at all, it was possibly early in the morning. She did not leave after the dinner hour that I

remember. After we left the carnival we went out on the Beggs road to Mrs. Stanger's. It was probably good dark. When we got back home, I got out and went in the house; and my husband went with me. We left Billie Ruth in the car. We told her we would be back in a few minutes, to wait. I went in and fed the dog; and my husband asked his mother if she would like to ride around with us. Joy Lynn Jernigan worked for me off and on. They both did. Sometimes it would be after school was out. Bettie Sue Pierce had not been in our house very often. I do not remember the occasion when she came over to play with the dog, shortly before school started. I do not remember leaving her in the house when I went to the grocery store. I did not hear any of the first conversation that the boys had with my husband, when they came over to our house, and told him they had heard he had been mistreating the girls. Mr. Hall told me what they wanted. I left the home about five o'clock. I did not make a call to the Pierce home shortly after I left."

Ellis Hall, the defendant, testified in his own behalf, stating:

"My name is Ellis Hall. I am the defendant in this case. I have never been in trouble before. I came here Thanksgiving Eve three years ago. I have been working at the Times as a lineotype operator. For several years my occupation has been printer. My occupation before I came here was printer and lineotype operator. I worked in the printing trade at Wewoka, Clinton, Mangum, and Elk City. Since coming here I have been continually employed by the Times Publishing Company. I know these girls that have testified. I never did mistreat either of them. When I first heard of what they were telling, was in the afternoon of the last day of the year, December 31st, 1937. The Biggins and Swafford boys told me. They were on my front porch. My wife and I were in the house, and I was at the typewriter fixing some coupons for shipment. She went to the door, and they told her they wanted to see me. They did not talk to her, and I got up and went to the door. One of them said, I don't remember which one of them it was, 'Billie Ruth Jernigan and Bettie Sue Pierce tell me you have done them wrong.' I said, 'What do you mean?' They said, 'That is what they say, that you have done them wrong.' I said, 'What are you talking about?' And they said, 'You

done them wrong.' And I said, 'You go tell them they are mistaken.' And they left.

"When they left they went to the Pierce home, and later they came back to my place. When they came back that time, they said, 'They still say it is true.' I told them, 'There isn't anything to it.' That is all the conversation we had. I went to the Times to go to work. I go to work at 4:45 in the afternoon. I usually get off about 10:30 to 11:00 to 12:00. I get off from my work at 1:15 in the morning. I do not remember ever having been asleep in my room when Joy Lynn Jernigan was in my room or in the house near where I was sleeping; and I never did do anything out of the way to her, or attempt to, or say anything to her that was improper.

"Billie Ruth was with my wife and I, and we went out to where my wife had been buying cream from Mrs. Stanger. We came back to our home. My wife and I got out and went into the house. Billie Ruth remained in the car. We came back out, and she was standing by the side of the car. I was not working that evening. When we started for a drive, Billie Ruth said she had some school work to do, and that she would not go with us. At no time on the 20th or 25th of August, 1937, or at any other time, did I ever take any liberties with Billie Ruth Jernigan. I did not pull her down on my bed in my bedroom, nor did I say anything to her that was improper. As I stated awhile ago, the first I heard of any complaint, was the 31st day of December, 1937, when these boys came to my house.

"When the Pierce girl makes the statement she does, she is mistaken, as I at no time ever mistreated her in any way, attempted to mistreat her, or say anything to her improper. Up until the time these boys came to my house, and mentioned what they had heard, the girls came back and forth often; and I saw no change in their action. We treated them as we had always treated them. I have never seen either of these girls in my bedroom at any time. My wife asked the girls to go with us to the circus. We did not have a phone at our house, and I wanted some aspirin tablets, and I sent my wife a note to bring them down as she was going to town. I wanted to take them, because I had some cold."

On redirect examination, the defendant stated when he retired to sleep, he slept in pajamas. "I do not sleep in shorts and undershirt. I use aspirins for a cold or headache. I have done it before and since this trouble occurred."

On re-cross-examination the witness stated that he had his wife bring the aspirins to him as he wanted to see what had happened.

On rebuttal Mrs. Golden Jernigan was called as a witness for the state, and stated that Billie Ruth had never had a date that she knew of; nor did she ever have any conversation with Billie Ruth about some boys that were going to college, and did not have any idea she was engaged to some boy that was going to college; and did not have a conversation with Mr. and Mrs. Hall relative to Billie Ruth keeping company with a boy going to college; nor did she ask them to find out.

Jack Swafford was called in rebuttal:

"I am the same Jack Swafford that testified awhile ago. When I went over to Mr. Hall's home and talked to him about what he had done and said to the Jernigan girls, Kenneth Biggins was with me. I did not say anything to Mr. Hall about having a knife, or make any reference to my having a knife."

Kenneth Biggins, called in rebuttal, stated that he was the same Kenneth Biggins that testified that morning.

"On the afternoon that Jack Swafford and I went to the home of Mr. Hall, neither Jack nor myself made a statement, or in substance stated, that we wondered how Mr. Hall would look with a knife stuck in his gizzard."

The foregoing is all the testimony introduced by the state and the defendant that it is deemed necessary to set out in this record. In fact, there are, perhaps, several pages of the testimony set out that is immaterial,

and some of it inadmissible, not being legally in support of the allegations in the information.

The defendant in this case has assigned ten errors alleged to have been committed by the trial court, which he insists are sufficient to warrant this court in granting him a new trial.

The defendant's first assignment of error is that the court erred in overruling plaintiff in error's motion for a new trial, to which ruling the plaintiff in error at the time excepted; the second, that the court erred in overruling the plaintiff in error's amended and supplemental motion for a new trial, to which ruling the plaintiff in error at the time excepted; the third, that the court erred in admitting incompetent, irrelevant, and immaterial testimony over the objections of the defendant.

The first, second, and third assignments of the defendant are all the assignments it is necessary for this court to consider, for the reason that the motion and supplemental motion for a new trial include all the other errors assigned by the defendant; and this court will consider the record as it finds it as to the testimony, the facts, and circumstances surrounding the parties prior to and subsequent to the time the alleged offense against the defendant took place, up to and including the 31st day of December, 1937.

The undisputed facts shown by the record are: That the defendant and his wife lived near the Pierce and Jernigan families; that the Jernigan girls and the Pierce girl were back and forth at the defendant's home often. The Jernigan girls helped Mrs. Hall with her domestic work; and that they continued to do so at intervals up to and including the 31st day of December, 1937.

If true, the crime alleged against the defendant occurred on or about the 20th of August, 1937. The relationship of the families continued unabated. The girls

came back and forth; and no mention was made to any one that the defendant had mistreated or attempted to mistreat Billie Ruth Jernigan on or about August 20, 1937.

It is singular, indeed, if the statements of the prosecuting witness are true, that she continued to associate with the defendant and his wife, and say nothing about it until the day that the Swafford and Biggins boys appeared at the Pierce home. If the defendant conducted himself as the prosecuting witness undertakes to say he did, his conduct was reprehensible, and could not be approved by any law-abiding citizen. But let us stop and think for a moment. The facts show that the wife of the defendant was there in the house; and if the prosecuting witness is to be believed, the wife sent her into her husband's room to wake him up. Does it stand to reason, is it human nature, and can anyone believe that the husband in a cottage home, where his wife was in an adjoining room, would attempt to have intercourse with a young girl? The prosecutrix, it is true, undertakes to say that the wife, on one or more occasions, tried to get her to go into the husband's bedroom, and get in bed with him, and have intercourse with him, for the reason that she was in such condition that she could not discharge her marital duties by having intercourse with her husband. This statement of the prosecutrix, which is denied by the defendant's wife, does not sound reasonable, and is contrary to the law of nature, and the domestic relations that exist between husband and wife.

It is difficult to believe that a wife, even though in ill health, would try to persuade a young girl who is beginning to develop into womanhood to go into the bedroom of her husband in her home, and permit it to be desecrated by having the husband cohabit with this girl. It does not stand to reason. We will, therefore, carefully examine the record and the law applicable to the facts in this case, and ascertain whether or not the evidence is

sufficient to sustain the conviction, and whether or not the defendant was given a fair and impartial trial, which he is entitled to under the law and evidence. Many questions are raised in this case, and several of them possess merit.

The defendant in his brief insists that the court erred and committed reversible error in the admission of the evidence of Joy Lynn Jernigan and Bettie Sue Pierce as to the alleged mistreatment of the defendant towards them at various times and subsequent to the offense charged in the information.

This testimony of Joy Lynn Jernigan and the Pierce girl related to the defendant's action in no way whatever connected with the charge in this case, and to separate and distinct offenses, if any, not in any way whatever tending to establish the charge against the defendant, the charge against the defendant being a specific charge for a specific offense; and the defendant insists that the court erred in permitting the testimony of Joy Lynn Jernigan and the Pierce girl to go to the jury over his objections.

16 C. J. 586, § 1132, sets out the general rule as follows:

"The general rule is that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same sort, is irrelevant and inadmissible. The rule extends to proof of an accusation of another crime, as well as to evidence of its actual commission." Miller v. State, 120 Ark. 492, 179 S. W. 1001; Boyd v. United States, 142 U. S. 450, 12 S. Ct. 292, 35 L. Ed. 1077; Alexander v. State, 24 Okla. Cr. 435, 218 P. 543.

In Miller v. State, 49 Okla. Cr. 133, 295 P. 403, 406, in the body of the opinion, this court made the following statement:

"The second error complained of by defendant is that the trial court erred in permitting the county at-

torney to exhibit in a spectacular and dramatic manner before the jury, while the defendant was on the witness stand on his own behalf, a young girl other that the prosecutrix, and to ask the defendant, while being a witness on his own behalf, many questions indicating and charging him with having attempted by force to have sexual relations with this other little girl thus then and there exhibited."

It seemed that this evidence was offered by the state for the purpose of showing the degenerate disposition of the defendant and the probability of the commission of the act with which he was charged. The court admitted this evidence, but when the court convened on the following morning, the judge withdrew it from the jury and made the following statement:

"The court was in error, gentlemen, in permitting that to be done. The state is not permitted to, in any way, attempt to show any other acts on the part of this defendant; neither should the county attorney be permitted to cross-examine the defendant relative to anything of that kind and all that occurred relative to those questions, and the answers, themselves, the answers given, are withdrawn from your consideration. Now, gentlemen, you are asked by the court to entirely erase from your minds, and in determining this case, not to take into consideration, in any way, either the questions that were asked this witness or the answers given or anything that occurred, at that time; remove it entirely from your minds in considering this case."

In that case the state made no further effort to introduce evidence of this character, and made no further mention of the same to the jury.

In Miller v. State, supra, this court further stated:

"Evidence of other acts with other women in the trial of a case like the one at bar should not be admitted. In arriving at this conclusion we are not overlooking the case of Dunscombe v. State, 19 Okla. Cr. 45, 197 P. 1073. The sex instinct is a natural and universal one, and the rule with respect to the admission of this kind of evidence should not be so broad as that laid down in the

case of State v. Rule, 11 Okla. Cr. 237, 144 P. 807, and Jackson v. State, 42 Okla. Cr. 86, 274 P. 696."

The Supreme Court of Idaho, in State v. Larsen, 42 Idaho, 517, 246 P. 313, among other things said:

"In criminal prosecutions, involving sexual crimes, it is not competent or permissible to show an evil disposition inclining defendant toward that particular crime, by acts totally disassociated with, and far remote in time from, the act of which he is accused, and against an entirely different female. It is utterly repugnant to fairness and justice to accuse a person with the perpetration of a specific and definite crime, and then make that a pretext for trying him, without notice, for another alleged offense against which he is unprepared to defend, thereby producing a prejudice and bias against him in the minds of the jury."

In State v. Williams, 36 Utah, 273, 103 P. 250, the Supreme Court of Utah, in the third syllabus, stated:

"In a prosecution for rape, it was reversible error for the state on cross-examination of the accused to compel him over objection to answer questions conveying the idea that he had permitted other children to call at his home in order that he might ravish them."

The commission of an independent offense is not proof in itself of the commission of another crime; yet it cannot be said to be without influence on the mind, for certainly if one be shown to be guilty of another equally heinous, it will produce a more ready belief that he might have committed the one with which he is charged, and is liable to inflame the minds of the jurors, and cause them to believe the prisoner guilty. It is not only unjust to the prisoner to compel him to acquit himself of two offenses instead of one; it is unjust and unfair to the defendant to burden a trial with multiple issues that tend to confuse and mislead jury.

From the nature and prejudicial character of such evidence against the defendant, that at different places and different times he had committed a similar crime to

that for which he is being tried, it is obvious it should not be received by the trial court unless the mind plainly perceives that the commission of the one tends by a visible connection to prove the commission of the other by the prisoner.

In Quinn v. State, 54 Okla. Cr. 179, 16 P. 2d 591, 596, Quinn was on trial for murder. Over the objections of the defendant the court permitted Mrs. Patton to testify that about 30 days prior to the homicide, she was crowded off the road, and was forced by the person who crowded her off the road to leave her automobile and to accompany the party to a side road, where the party raped her. She identified the defendant, Quinn, as being the party who committed the crime.

This court in passing upon that question said:

"The evidence of Mrs. Patton was improper and highly prejudicial. No instruction of the court could take this last impression from the minds of the jury. The admission of this evidence would have required a reversal of the case, even though there were no other errors in the record."

The admission of the testimony of Joy Lynn Jernigan and Bettie Sue Pierce, over the objections of the defendant, was reversible error, as there was nothing to indicate that their statements as to what the defendant had done to them had anything to do with the charge the defendant was on trial for.

The next question to be considered is the question, Is there sufficient evidence against the defendant to sustain a conviction of the crime of attempted rape?

The circumstances under which the prosecuting witness attempts to charge this defendant with an attempt to commit rape are such that it seems unreasonable that any sane man under such circumstances would have attempted to have sexual intercourse with the prosecutrix.

He was there in his home with his wife and this young girl. The prosecutrix says she went to his room to wake him up, and that he pulled her down on the bed, and (to use her expression) he fingered her, and that she kicked him with her knee; he rolled away, and she got up and went home. This was in August, and from that time until December 31st, 1937, this girl was back and forth to the home of the defendant and his wife, coming there at different times, and going out with them on one or more occasions; and still nothing was said about what the defendant had done to her on or about the 20th of August, 1937.

What prompted this prosecution is not apparent from the record; nor is the reason why the prosecuting witness waited from August until the last day of December to impart to her mother and others the information that the defendant had attempted to have sexual intercourse with her. It does not stand to reason that the statement is true.

The Code of Criminal Procedure provides that:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." Section 3097, O. S. 1931, 22 Okla. St. Ann. § 916.

An attempt to commit a crime is defined in the Penal Code, section 1822, O. S. 1931, 21 Okla. St. Ann. § 42.

The intent is the gist of the offense charged against the defendant; and every laying of hands on the female under the age of consent, even though improper, does not necessarily imply intent to have sexual intercourse. Indecent liberties may be taken with a child without any such intent. Our statutes recognize this in providing a penalty for taking indecent liberties with a female child without intent to commit the crime of rape. Penal Code,

sec. 1769, O. S. 1931, 21 Okla. St. Ann. § 22; West v. State, 27 Okla. Cr. 125, 25 P. 2d 556.

An assault with attempt to rape or attempt to commit rape includes every element of the crime of rape except the accomplishment. The intent to rape must be coupled with the specific intent to make out an offense. Intent, which is essential to support a conviction of an attempt to commit rape, cannot be assumed, but must be shown by competent evidence, and beyond a reasonable doubt.

In People v. Dowell, 136 Mich. 306, 99 N. W. 23, the court said that the intent is the gist of the offense, and that every laying of hands on a female under the age of consent, even though it is improper, does not necessarily imply an intent to have sexual intercourse. Indecent liberties may be taken with a child without any such intent. In such cases the laying on of hands upon the female and the intent to have sexual intercourse with her must concur at the same time. 33 Cyc. p. 1435.

In the case of Patrick v. People, 132 Ill. 529, 534, 24 N. E. 619, 620, it is said that to constitute an attempt to commit rape upon a female under the age of consent, the intent to know the girl carnally must have existed in the mind of the accused when he did the overt act or acts, for there can be no attempt to commit the crime unless the intent to commit it exists at the time the attempt was made; and see 1 Wharton, Criminal Law (11th Ed.) par. 215.

The only testimony in the record to show that when the prosecutrix went to the defendant's room to call him, he made an effort to have sexual intercourse with her, is the testimony of the prosecutrix, standing alone. The wife of the defendant was in the house at the time the prosecutrix claims she went to the defendant's room; and the prosecutrix claims that the wife directed her to go to the defendant's room and wake him up.

The court committed reversible error in admitting, over the objections of the defendant, the testimony of Joy Lynn Jernigan and Bettie Sue Pierce, as their testimony tended to establish the action of the defendant with these girls at different times and places, and had no connection whatever with the crime for which this defendant was on trial.

The defendant, testifying in his own behalf, denied that he did anything to the prosecutrix in any way whatever to indicate that he was attempting to have sexual intercourse with her.

The wife of the defendant contradicts the prosecuting witness in her statements, as to the wife's trying to get the prosecutrix to go into the defendant's room and have sexual intercourse with him.

Considering these facts, and the fact that the prosecutrix waited so long before saying anything to her mother or to any one else as to what she claimed the defendant tried to do to her, and considering the further fact that the prosecutrix continued to be friendly with the defendant and his wife from August to December, we are inclined to think that the defendant was prosecuted without just cause. The court seems to have forgotten that the defendant was presumed to be innocent of the crime charged against him until overcome by competent proof of his guilt, and that the law of the land guaranteed to the defendant a fair and impartial trial. The safeguards erected by the Constitution and laws of our state are intended to protect the rights of all citizens alike. They protect the rights of the guilty as well as those of the innocent; and before a defendant should be convicted of a crime, he should by competent evidence be proven guilty beyond a reasonable doubt.

This court cannot give sanction and approval to the conviction of any person accused of crime, where the proceedings upon which the charge is based show that

the accused did not have that fair and impartial trial to which he was entitled under the law.

Many of the defendant's neighbors, who had known him for a number of years and who had lived in the community where this charge was brought against the defendant, testified in his behalf as to his previous good character. The state did not contradict, or attempt to contradict, the character witnesses, who testified for the defendant, but left their testimony, which was entitled to consideration by the jury in arriving at its verdict, unchallenged.

No man ought to be convicted of crime on mere suspicion or because he might have an opportunity to commit it. In order to sustain a conviction, there must be competent testimony, sufficient to convince the minds of the jurors beyond a reasonable doubt of the guilt of the defendant.

This court has no doubt that if the trial court had excluded the incompetent testimony of Joy Lynn Jernigan and Bettie Sue Pierce, and had declined to give instruction No. 9, which he gave over the objections of the defendant, based on the testimony of the Jernigan and Pierce girls, there was not sufficient testimony to sustain a conviction of attempt to commit rape.

For the errors herein above set forth, this case is reversed, with directions to dismiss.

DOYLE, P. J., and BAREFOOT, J., concur.