Paul W. McMAHAN, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12771.

Court of Criminal Appeals of Oklahoma.

March 2, 1960.

Rehearing Denied Aug. 3, 1960.

Geb & DeFord, Ponca City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Plaintiff in error, hereinafter referred to as the defendant, was charged by information in the District Court of Kay County with the crime of embezzlement. He was tried before a jury, was found guilty by the following verdict returned by the jury:

> "We the jury empanelled and sworn to try the issues in the above entitled cause, do, upon our oaths, find the defendant guilty, but unable to agree on the punishment and leave the punishment to the court. However, we recommend leniency *do* to circumstances."

The jury being unable to agree upon the punishment, defendant was sentenced by the trial judge to serve two (2) years in the state penitentiary.

Defendant lodges his appeal within due time and advances three assignments of error upon which he relies for reversal.

Defendant's first proposition of error contends that the best evidence rule was

violated in the admission of oral testimony describing the authority of defendant in his capacity as vice-president and general manager of the Conner Sheet Metal and Roofing Company, a corporation of Ponca City, Oklahoma.

It appears from the record that defendant while acting as vice-president and general manager of said corporation did on about the 21st day of February, 1956, write a check in the amount of $637.19, drawn on said corporation and made payable to Homer Luther who was the owner of a music store in Ponca City. Mr. Luther testified the check was given as payment for a Wurlitzer piano and a Fender guitar, which defendant admitted buying for his little boy and girl. Defendant denies his intention to embezzle funds by contending the amount of the check was to be deducted from his bonus at the end of the year.

■ Defendant's first contention of error arose out of the effort of the county attorney to establish what authority defendant had to write checks on the corporation.

The testimony about which defendant complains as violating the best evidence rule is related in defendant's brief as follows: (pages 55–56 CM).

"Re-direct examination of Mr. Charles Gray, by Mr. Don Welch, Assistant County Attorney. Re-direct examination by Mr. Welch:

"Q. Mr. Gray, I want to clear up a point or two—did I understand you to say that Mr. McMahan had authority to write checks for any purpose? A. He had authority to write checks for any business, for business purposes for the Conner Sheet Metal & Roofing Company.

"Mr. Geb: We object to that, he has already testified that he didn't know.

"The Court: Well, inquire if he knows.

"Q. Do you know then, what the limitation upon his authority was? A.

I'm sorry, but I can't hear you very well.

"Q. Do you know what the limitations upon his authority were? A. Yes.

"Q. What were the limitations upon his authority concerning writing checks? A. Well, he was limited to writing checks for the business alone, no other business, nothing but just the business of Conner Sheet Metal & Roofing Company.

"Mr. Geb: We are going to object to that, the By-Laws and rules were here and he said he couldn't find it in there and he wasn't an officer, it would strictly be hearsay testimony, he wouldn't know, the books and the By-Laws are the best evidence what authority he had.

"The Court: Overruled.

"Mr. Geb: Exception."

We are unable to recognize the seriousness of this contention. The record reveals that the questions about which defense counsel complains were first propounded by the defense on cross-examination. Prior to that defense counsel had asked Mr. Gray, the president of the corporation if he had the By-Laws and they were obtained and evidently Mr. Gray testified with the By-Laws in his hand. The following questions were asked and answers returned:

"A. I think they have them right there. (County Attorney retires to secure same)

"Q. I will ask you some more questions about it while he is getting them—you own several roofing companies or did own several roofing companies during the year of 1954 and '55, didn't you, Mr. Gray? A. Yes, I owned two or three, yes, I had stock in two or three, let's put it that way.

"Q. What was the policy of these companies that you owned or owned stock in, including the company that we are talking about today, as far as

an executive officer being entitled to a bonus was concerned—did you provide for a bonus for the executive officer in charge? A. No.

"Q. You say you didn't? A. There was no recorded or no system of bonuses in any of the companies.

"Q. There might not have been a system, but has a bonus ever been paid by your company to an executive officer? A. Yes, sir.

"Q. As a matter of fact, it was the general rule to pay an executive officer or the officer in charge of the particular plant there a bonus, wasn't it? A. No, there was no rule, it was just a policy of mine to pay bonuses to whom I saw fit.

"Q. Now, will you show the jury here where you acted or were authorized in any capacity in 1956, February 21, 1956, where you had any authority whatsoever to determine what Mr. McMahan could or could not do? (Showing witness record book.) A. In the By-Laws?

"A. Yes, sir.

"A. I say there's nothing in the By-Laws, there isn't anything in the By-Laws to that effect.

"Mr. Haynes: Objected to—

"The Court: Sustained, he said the By-Laws did not provide for an assistant to the President.

"Q. Will you show to the jury in the By-Laws where there is any limitation on Paul McMahan's authority to write checks, during February of '56, February 21, 1956? A. A limitation on his authority to do what?

"Q. To write checks. A. To write checks?

"Q. Yes, sir? A. I think I can show where there is a limitation to write checks for anything other than the company business.

"Q. Well, just show where there's any limitation whatsoever? A. Well,

let's see. Well, in the By-Laws under Treasurer-General Manager—

"Q. Now, was he treasurer and general manager? A. That was changed I think on February 20 from Treasurer-General Manager to Vice-President General Manager.

"Q. That's what I want, where he has any limitation as vice-president and general manager? A. As vice-president?

"A. Yes?

"A. No.

"Q. He had no limitation then on his authority to write checks? A. Except this—"The vice-president shall in the absence or disability of the president perform the duties and exercise the powers of the president, and shall perform such other duties as the Board of Directors shall prescribe." Under General Manager-Treasurer-General Manager—

"Q. I just want to ask you what his office was, I don't want to—he was vice-president and general manager? A. Yes, sir, that's his duties.

"Q. There's no limitation on his authority as vice-president-general manager? A. But as general manager there was.

"Q. As vice-president-general manager, was there? A. As Treasurer-General Manager, or General Manager?

"Q. His office now is vice-president-general manager? A. His office, he's the vice-president. As an officer he is also general manager.

"Q. Was there any limitation on his office as vice-president and general manager to write checks? You can answer that yes or no, Mr. Gray to simplify it? A. Well, let's see, I think there's another section to this here if I can find it. (Examines record.)

"Mr. Welch: I think that question has been asked and answered once.

"The Court: Oh, he's still looking.

"A. I think the secretary could answer this better, he can answer it quicker.

"Mr. Geb: We are going to object to any comments made.

"The Court: It will be sustained.

"A. Well, I can't find it right now, I just don't know if there's anything in there that limits the vice-president's authority to sign checks.

"Q. You know, as a matter of fact, that there wasn't any limitation, don't you, Mr. Gray, and everything was in his own discretion? A. Signing checks?

"Q. Yes? A. Yes, I would say that it was, that's true, he could sign any check that he wanted to sign."

It is further to be observed that the By-Laws were introduced into the record and became a part thereof as exhibit 2. Surely, defendant could not be heard to complain about evidence which he first brought into the case. The questions of the county attorney were in substance the same and were propounded as he stated to "clear up a point or two." We agree with defendant's contention that the records of the corporation is the best evidence and if available will preclude oral testimony as a substitute thereof. However, it would be an abortion of the rule to say it applied in the case at bar as the testimony was first produced by the defendant. In addition, the By-Laws obviously did not cover the subject in question.

The casemade (page 63) reveals that defense counsel established this fact during the process of cross-examining witness Gray as follows:

"Q. All I want is the restrictions as to checks of the vice-president and manager—can you tell the Jury that? A. There's nothing in the book that says anything about restrictions as to checks, but the limitation by any business in its transactions—

"Q. That's all I wanted, it's not there, is it? A. Not in the book, it wouldn't be in any book.

"Q. And this is the By-Laws of the Corporation that Mr. McMahan was vice-president and manager of? A. That's right, of course, you know the restrictions wouldn't be in the By-Laws."

Had the facts to be proved been covered in the By-Laws they would have been the best evidence, but since the By-Laws did not cover the subject they could hardly be classified as the best evidence to prove the matter.

Defendant next complains that the court erred in admitting evidence to which defendant objected of other similar transactions, about seven in number. The other transactions involved the giving of checks for merchandise, furniture, an airplane, boat and motor, insurance and other items of service or value not designated as company business. The books of the company revealed these expenditures were charged to such accounts as roofing purchases, sheet metal account, etc. The checks establishing said transaction covered a period of time extending over 22 months. In the case at bar defendant admitted the expenditures but denied any intent to embezzle from the corporation of which he was vice-president and general manager. Thus, the question of good faith or intent of defendant's actions in writing checks became a very important factor to the state's case as to whether it would show a guilty scheme or plan on the part of defendant to embezzle company funds, and the intent with which the alleged act was performed.

The question as to the admissibility of collateral transactions has been a problem of the utmost concern to this Court in every instance wherein it arises. There are divided authorities in different jurisdictions as to the application of law. However, exhaustive research on the question reveals a well established rule recognized substantially by all jurisdictions that evidence of a separate and similar offense is

not admissible against the accused on trial for another specific offense; that, when the accused is put on trial for one offense he is to be convicted, if at all, by evidence which shows him guilty of that offense alone and proof of guilt of one or more alleged similar offenses unconnected with that with which he is on trial is inadmissible. This court has followed the rule uniformly in numerous cases. See Hall v. State, 67 Okl.Cr. 330, 93 P.2d 1107; Clark v. State, 66 Okl.Cr. 255, 91 P.2d 686; Janeway v. State, 62 Okl.Cr. 264, 71 P.2d 130; Brockman v. State, 60 Okl.Cr. 75, 61 P.2d 273. For numerous citations supporting this view see Roulston v. State, Okl.Cr., 307 P.2d 861.

To this general and well excepted rule there are certain exceptions and though they do not supersede the time honored precept of law and are to be carefully limited and guarded, they have become well established in the courts throughout the land. The difficulty comes in applying the exception to the general rule and distinguishing what is competent and what is not.

This court said in the connection in the case of Michelin v. State, 66 Okl.Cr. 241, 90 P.2d 1081, 1083:

"We realize that this question is of serious import in the trial of criminal cases in this state. Every person charged with the commission of a crime is presumed to be innocent until his guilt has been established beyond a reasonable doubt. That he shall be charged with but one offense, and that he shall not be convicted for the commission of an offense other than the one charged. The court should, therefore, be very careful in drawing the line as to the introduction of this testimony, and in seeing that it comes clearly within the exception to the general rule before it is permitted to be introduced."

Also, see People v. Peete, 28 Cal.2d 306, 169 P.2d 924.

The courts in most jurisdictions have adopted five exceptions to the general rule whereby testimony of other similar transactions become competent when it is material and proper to show: 1. Motive 2. Intent 3. Absence of mistake or accident 4. Identity of the person charged with the commission of the crime for which he is on trial, and 5. Common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other.

The law is clear that in order for evidence in the case at bar, concerning other related transactions to be admissible, it must come within one of the five exceptions above stated. No doubt these exceptions to the general rule have been allowed in furtherance of the administration of justice. However, the court has repeatedly held that these exceptions to the general rule should be exercised with the utmost caution and your author is of the opinion they should not be enlarged upon or permitted except wherein their admissibility comes within the heretofore enumerated exceptions.

In the case of Nickels v. State, 90 Fla. 659, 106 So. 479, 488, the question is very clearly set forth as to why strict limitations would be placed upon exceptions to the general rule as follows:

"Evidence that the defendant has committed a similar crime, or one equally heinous, will frequently prompt a more ready belief by the jury that he might have committed the one with which he is charged, thereby predisposing the mind of the juror to believe the prisoner guilty."

A study of the matter indicates that the courts have been liberal in their application of exceptions to the general rule in such cases as embezzlement, forgery, and obtaining money under false pretense. Boyer v. State, 68 Okl.Cr. 220, 97 P.2d 779; Chappel v. State, 74 Okl.Cr. 213, 124 P.2d 742.

The court is of the opinion in the case at bar evidence of the similar transactions was competent within the rule that proof of other offenses may be admitted in

evidence upon the trial of the defendant where the same was part of a general system, scheme or plan, and to prove the intent with which the act was performed. The rule is aptly stated in 18 Am.Jur. 608, 609, § 62:

"The general rule in criminal cases that proof of other offenses is admissible for the purpose of showing criminal intent in the commission of the offense with which the defendant stands charged is applicable in prosecution for embezzlement."

Also see State v. Wetzel, 75 W.Va. 7, 83 S.E. 68; Miller v. State, 88 Tex.Cr.R. 69, 225 S.W. 379, 12 A.L.R. 597; State v. Brady, 100 Iowa 191, 69 N.W. 290, 36 L.R.A. 693.

Oklahoma has passed upon the question in such cases as Winston v. State, 16 Okl. Cr. 648, 185 P. 832, wherein the court said:

"Where the defendant, the cashier of a railway company, is charged with embezzling a specific sum of money on a certain day, evidence tending to show that he, on numerous dates for about two months immediately preceding the date of the alleged embezzlement upon which a conviction was had, regularly took other similar moneys from the railway which had come into his hands as cashier, was properly admitted as tending to show a system and regularity of embezzlement by the defendant from day to day, and as also tending to connect defendant with the commission of the offense charged."

In the case of Sawyer v. State, 73 Okl.Cr. 186, 119 P.2d 256, 257, the court said:

"Proof of other shortages in his accounts, as treasurer for a school district, may be admitted in evidence upon the trial of defendant for embezzlement of funds from the school district to show a general system, scheme or plan of embezzlement, and to prove the intent with which the act alleged to have been perpetrated was done."

In the Sawyer case, supra, numerous citations are listed that support this holding.

It is therefore readily observed that exceptions to the rule have become well established in this and other jurisdictions. However, it was never intended that such evidence could be received except for a limited and specific purpose. To receive such other evidence without proper instructions as to the limitation of its consideration would constitute prejudicial and harmful error. In this type case the court should charge the jury by proper instruction that: 1. Evidence of other checks given in a similar transaction can only be considered to show the intent of the defendant and his common scheme of conduct, if in fact they show such intent or system of conduct, *and for no other purpose*. 2. That evidence of the other checks are not to be considered for any purpose except such checks or transactions as the jury may find and believe from the evidence beyond a reasonable doubt were given with the unlawful, fraudulent, and felonious intent by the defendant to cheat, wrong, and defraud the rightful owner.

See Fry v. State, 83 Tex.Cr.R. 500, 203 S.W. 1096; Pelton v. State, 60 Tex.Cr.R. 412, 132 S.W. 480; Am.Jur. Vol. 20, 299; State v. Hyde, 234 Mo. 200, 136 S.W. 316; Greenleaf on Evidence, Vol. 3, § 111.

Your writer is firmly of the opinion that in every case where evidence of similar transactions are admitted, the rights of the defendant should be safeguarded by the courts charge in telling the jury in substance as above stated.

The only question for the court to decide in this regard is whether or not proper instructions were given limiting the purpose for which said evidence was received. It is to be observed from the transcript that when offer of other instruments was first made there was objection on the part of the defendant. The objection was overruled by the trial judge followed by oral admonition to the jury as follows:

The Court: Members of the jury, the state is now *offering proof of other offenses*. You are further instructed that the defendant is on trial for the one offense, charged in the information in this case and cannot be convicted of any other offense in this case. Evidence of other *offenses is being admitted* for the limited purpose of assisting you in determining the *guilt or innocence* of the defendant to this charge for which he is on trial, and for the limited purpose of tending to prove a general scheme or plan and to prove intent with which the alleged act was perpetrated.

"Defense Counsel Mr. Geb: Note our objections and exceptions."

The court is of the opinion that this admonition to the jury was improper, insufficient, and contrary to law. The language "the state is now offering proof of other offenses" constitutes a prejudging of the evidence and an invasion of the jury's province. Actually, the state was presenting evidence of other checks or transactions or collateral or related transactions which at the most were alleged offenses, and whether or not they constituted an "offense" was a question for the jury. The word "offense" is synonymous with crime. It means an act done wickedly and against the law.

"An offense," says Mr. Wharton, "which may be the subject of criminal procedure, is an act committed or omitted in violation of the public law, either forbidding or commanding." United States v. Chapel, 25 Fed.Cas. page 395, No. 14,-781.

The word "offense" implies a violation of a law by which alone it can be denounced. Thomas v. United States, 8 Cir., 156 F. 897, 17 L.R.A.,N.S., 720.

The terms "crime," "offense" and "criminal offense" are all synonymous and are ordinarily used interchangeably and include any branch of law established for the protection of the public as distinguished from an enforcement of mere private rights, for which a penalty is imposed or punishment inflicted in judicial proceedings. State v. West, 42 Minn. 147, 43 N.W. 845, 847. For other definitions in accord see 29 Words and Phrases, Offense, pp. 217, 224.

The trial judge in substance told the jury "that the state is now offering proof of other crimes." This was a presumption on the part of the trial judge and whether the other checks or transactions constituted offenses was to be determined only by the jury. The consideration of the evidence as to other checks or transactions should have been limited to the purpose of showing the intent of defendant in giving the check named in the information or to show a common scheme or plan and for no other purpose. Also, that the evidence could not be considered for any purpose unless the jury was convinced beyond a reasonable doubt that the other checks reflected an act constituting embezzlement.

Defendant next contends that the closing argument on the part of the county attorney was prejudicial to the defendant and that the court failed to admonish the jury to disregard the statement complained of. Defense counsel contends that the defendant was referred to in the closing argument as a *liar, thief, and a stealer*. The argument was transcribed and that portion referred to reflects the following:

"We contend that his intent at that time was to embezzle this company out of that sum of money, to acquire this property for his own use, and that he never intended to repay the company back in any way. And I think Mr. McMahan crawls with guilt in that regard. *You and I, I am sure, and everybody in this court room today has nothing but contempt and the lowest form of contempt for liars, thieves, and stealers, and we have every one of them involved in this case before us today.* This is serious business.

"Mr. Geb: Note our objection to those remarks."

Defendant further complains of the county attorney calling the jurors by their first names in an attempt to prejudice the defendant. The transcribed argument reveals that the following statement was made in the county attorney's closing argument:

"Delmont (a juror) you could just let your men down there in that grocery store do ever what they want to do and write their own checks and their own bonuses. Anybody else could do the same thing and we could forget about prosecuting people for embezzlement."

(It is to be noted that there was no objection made to this statement by the county attorney, or exceptions taken.)

The defendant contends the remarks constitute grounds for reversal and cites as authority therefore Donaho v. State, 58 Okl.Cr. 198, 51 P.2d 348–349. In that case the county attorney in his argument to the jury called particular jurors by their first names in an intimate manner and referred to the defendant as "a robber and a thief" and stated that if the jury had any "backbone or respect for the county attorney and the laws * * * they would return a verdict of 'guilty'." In that case the court said:

"While prosecuting attorneys are not expected to maintain a judicial impartiality, yet it is their duty to present a case fairly and justly. Obviously the remarks of the prosecuting attorney in this case were highly improper as statements of facts not in evidence before the jury, and the court erred in overruling the objection thereto."

The court cited Thurmond v. State, 57 Okl.Cr. 388, 48 P.2d 845.

However in the Donaho case, supra, to said statements the defendant objected and demanded the court reporter be called for the purpose of taking down the remarks and making a record thereon, which demand was denied by the court.

We are in accord with the conclusion reached in the Donaho case. The defendant in the instant case put his character in issue and the testimony showing that he bore a good reputation as a law abiding citizen was not controverted. The statements of the county attorney were not substantiated by evidence, but the record made by defendant to these remarks are not sufficient to have the questions decided herein. In such cases, counsel for the defense must not only object to improper statements of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were of such a character that the error would not be cured by a withdrawal of the remarks. See Daves v. State, 77 Okl.Cr. 343, 141 P.2d 603; Gorum v. State, 67 Okl.Cr. 75, 92 P.2d 1086; Conway v. State, Okl.Cr., 320 P.2d 419. It is to be observed there was no objection to the latter portion of the argument about which the defendant complains to the first only this: "Note our objection to these remarks." The court was not given an opportunity to pass upon the question and the defendant cannot now be heard to complain. It is well to state, however, the attorney should refrain from such intimacy with the jury as might tend to breed familiarity to the detriment of the defendant. Likewise, remarks as to defendant's character not supported by the record should not be indulged in.

As a result of the error heretofore discussed, the court is of the opinion that justice would be best served if defendant was afforded a new trial in conformity with this opinion. Therefore, the judgment and sentence of the trial court is set aside and the cause reversed and remanded for a new trial.

POWELL, P. J., and BRETT, J., concur.