# RILEY THOMAS v. STATE.

No. A-9585.   Oct. 19, 1939.
(95 P. 2d 658.)

2

Babb & Babb, of Poteau, for Plaintiff in error.

Mac. Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. Riley Thomas was by information filed in the district court of Le Flore county, Okla., charged with the crime of first degree rape, alleged to have been committed on Wanda Lee Walker, under the age of 14 years, to wit: the age of five years. Defendant was tried, convicted, and sentenced to serve a term of four years in the state penitentiary. Motion for a new trial was filed, overruled, exceptions saved; and the defendant appeals.

The first witness for the state was Wanda Lee Walker. She stated. "My name is Wanda Lee Walker."

"By Mr. Babb: Now, if the court please, I desire at this time to object to the testimony of the witness, Wanda Lee Walker, for the reason that she is of such tender years that she is not capable or competent of knowing the force and effect of an oath, or the solemnity of an oath."

(The jury was excused from the courtroom).

The witness continued:

I am five years old. I live at Whitesboro, Oklahoma. My father's name is Charley Walker. By the Court: Q. Have you ever gone to school any? A. Yes, Ma'am. Q. Where do you go to school? A. Whitesboro. Q. What do you study? What books do you study? A. Teacher don't let me study. Q. You haven't been taught to read, then, is that right? You haven't been taught to read? (No answer) Q. How old are you? A. Five years old. Q. Do you remember when you were five years old? A. Unh huh. Q. Ever go to Sunday School any? A. Unh huh.

Q. You don't know what happens to children who tell things that are not true, that tell stories? A. Unh huh. Q. Do you know that it is wrong to tell things that are not true? A. Unh huh. Q. Did your father ever tell you that? A. Unh huh. By the Court: Do you gentlemen want to ask her anything? By Mr. Babb: I don't. By Mr. Followell: Q. Do you know whether children are supposed to tell the truth or not? A. Unh huh. Q. Were you ever taught by anybody not to tell stories? A. Unh huh. By the Court: Q. You say you never attended Sunday School any? A. Hu, huh. Q. Do you know what happens to children that don't do right? A. Uh, huh. Q. How old do you say you are? A. Five years old. Q. What's your teacher's name down there at Whitesboro? A. Miss Mercer. Q. How long have you been going to school there? (No answer) Q. How long have you been going to school down there? A. I don't know. Q. About how long? Did you start this last fall? A. Yes, Ma'am. Q. Started this last fall? (No answer) By the Court: All right. Anything further? By Mr. Babb: No questions. By the Court: Anything further from the county attorney? By Mr. Followell: Nothing further. By the Court: I believe I will let her testify, and we can figure out a little more about it a little later on. The objection is overruled. By Mr. Babb: "We except."

(The jury returned into court).

"By Mr. Followell: Q. You say your name is Wanda Lee Walker? A. Yes, Ma'am. Q. How old are you? A. Five years old. Q. Where do you live? A. Whitesboro. Q. Do you know this defendant Riley Thomas over there? A. Yes, Ma'am. Q. Do you remember about the 29th of March, when he is alleged to have made an assault on you down there in his shop? Remember that day? A. Yes, Ma'am. Q. Was you in his shop that day? A. Yes, Ma'am. Q. Who was in there with you? A. Riley. Q. What did he do to you that day? (No answer) Q. Just go ahead and tell what he did? (No answer) Q. Were you on the bed there in the shop? By Mr. Babb: Now, just a minute, I object to counsel leading the witness. By the Court: Don't lead the witness. A. He put me on

the bed and pulled my breeches. Q. Did he do anything else? (No answer). Q. Just go ahead and tell what else happened? (No answer) Q. Did anything else happen there? Now what else happened? Go ahead and tell these men here. (No answer) Q. You say he pulled your breeches off? A. Yes, Ma'am. Q. Did he get on top of you? By Mr. Babb: Now, we object to counsel leading the witness. The court has just ruled on that. By the Court: Overruled. By Mr. Babb: Exception. Q. Were you hurt any while there on the bed? A. Yes, Ma'am. Q. Now, how were you laying—both laying down? A. Yes Ma'am. Q. Which one was on the bottom? (No answer) By Mr. Followell: That's all. By Mr. Babb: No questions. By the Court: Q. What do you say your name is? A. Wanda Lee Walker. Q. You say you know Riley Thomas over there? You do, do you? A. Yes, Ma'am. Q. Do you live near where he lives? (No answer) Q. Where do you stay? Do you live with your mother and father? A. Yes, Ma'am. Q. Where did your mother and father live and where did you live with reference to where Riley Thomas lives? How far did you live from his place? A. Just a little ways. Q. What kind of a house did Riley Thomas live in at that time? (No answer) Q. Did he live in his blacksmith shop? A. Yes, Ma'am. Q. How did you happen to go over to Riley's place on this day you talk about? Did you go there by yourself or with some one? A. Went by myself. Q. Now, where was Riley when you first went over there? Was he in his blacksmith shop or the room where the bed was? A. He was in the blacksmith shop. Q. Did you afterwards go into the room where the bed was? You first went in the blacksmith shop, is that right? A. Yes, Ma'am. Q. Did you afterwards go to the room where the bed was? A. Yes, Ma'am. Q. Who went in there first? Did you go in there first or did Riley go in there first? Do you remember? (No answer.) Q. Why did you go from the blacksmith shop into the room where the bed was? (No answer) Q. Did you go in there first? A. Yes, Ma'am. Q. Then what did Riley do? Why did you go in the room where the bed was? (No answer) Q. You say you were hurt, were you? A. Yes, Ma'am. Q. What did you do about that? Did you tell

anybody about that? (No answer) Q. Who did you tell you were hurt, if you told anyone? Who is the first person you told, if you told anybody, you were hurt? (No answer) Q. Just speak out, now. (No answer) Q. Did you tell anybody you were hurt? (No answer) Q. I don't believe you answered the question, did you tell anybody? A. I told my mother and daddy. Q. How long before you told anybody you were hurt? A short time or a long time after you were hurt? A. Long time. Q. Was it the same day? Did you tell them the same day you were hurt? A. Yes, Ma'am. Q. You say you told your mother and father, were they together at the time you told them? A. Yes, Ma'am. Q. Just what did you tell your father and mother? (No answer) Q. What did you tell your father and mother? (No answer) Q. What did you tell your father and mother? (No answer) Q. What did your mother and father say to you at that time—at the time you told them? (No answer) Q. What did they say to you when you told them? A. Nothing. By the Court: All right, anything further? By Mr. Followell: That's all. By Mr. Babb: No questions. By Mr. Babb: Now, the defendant moves that the testimony of this witness be stricken for the reason given in the objection to the introduction of the testimony. By the Court: "Overruled." By Mr. Babb: "Exception."

Lula Walker, a witness called on behalf of the state, stated:

"My name is Lula Walker. I live at Whitesboro. I am the mother of Wanda Lee Walker. I know the defendant Riley Thomas. I know all about Riley Thomas being charged with having intercourse with my daughter Wanda Lee. I found out the happening when my little girl came by the house, the one next to the baby, and said Riley Thomas gave her some money. By Mr. Babb: We object to that. By Mr. Followell: We are not asking for that. By the Court: Yes, sustained."

The witness continued:

"I noticed the other little girl, and not this one. I went down to the shop and called this little girl of mine,

Wanda Lee; and she answered me. The doors were all fastened. The doors to the shop where he was living were fastened on the inside. She answered me; and I heard Thomas say to hurry. I looked in the hole in the door, not any bigger than a half dollar, and could see the child getting off of his bed, putting on her clothes. The child came out with one suspender on and one off. We went to the house; and she upped and told me."

Mr. Babb objected. The objection was overruled; and exception saved.

"She upped and told me he pulled her clothes off and laid her on the bed and got up on top of her. The shop is located at Whitesboro, Le Flore county, Oklahoma. I had her examined after that by Dr. Reynolds."

On cross-examination the witness stated:

"It happened along, I guess, between 3 and 3:30, Tuesday, the 29th day of March, 1938. There was a school election being held at the schoolhouse that day. When I left my house, I went straight to the blacksmith shop. I went to the side door, the one he used to keep open all of the time, and that one was closed. I went to the front one. The first door I went to, I pulled on the door, and it was fastened. This was the side door, right behind Mr. Ming's store. I then went to the front door, that is the door that fronts on the street. I went back to this other door, down farther, and looked through the one right next to the garden fence. There are two doors to the west wall of the shop, I reckon. I first went to the one next to the front, and then went to the front one, before I went to the back one. Then I went to three doors. The one where I saw my daughter was to the back end, on Mr. Ming's store. There was a little bitty hole there where the iron log chain goes through, and that is what I looked through. When I saw her, she was on the edge of the bed. The bed was to the left of me. The keyhole was the only place I could see through. The little girl came out the door where the keyhole was. The door was fastened on the inside; and she unfastened it. I went back to my house, and asked her about it, and then went to Mrs.

Baughman's. Q. What did you say to her? A. I told her what he done. Q. What did you tell her? A. I said he had my little girl in there, and had her clothes off, and she said he was on top of her, and I wanted her to give me some advice. Q. What did you want to do? A. She said, 'I would kill him,' and I said, 'That's what I thought, too,' but didn't want to do that."

The witness continued:

"I told Mrs. Baughman if he would get out of there, I would not care to have him arrested. I went from there to Tom Bowen's house; and he wasn't there. Then I went back down to Mrs. Baughman's and she said we would go to the schoolhouse, and see Henry. I didn't tell Mr. Baughman, exactly, I didn't want anything done with him. I told him I wanted him to get up, and get away from there. That was what I wanted done, if he would get out. I have a brother named Pete Edwards. He came there about 11 o'clock. We had lived in this house in Whitesboro about a month and a half. My husband was not in town at the time. He came in when he quit work, between 5:30 and 6 o'clock. I had had Riley Thomas arrested at the time my husband came. I had not seen anybody besides Mrs. Baughman, and talked to them. I only talked to Mr. Bowen. He is the only man I talked to."

On redirect examination, the witness stated:

"At the time I saw my little girl on the bed, Riley Thomas was laying on the bed; and he appeared to be asleep, when I called the little girl, and she opened the door."

Dr. James B. Reynolds, testifying for the state, stated:

"My name is James B. Reynolds. I live at Talihina, Okla. On the 29th of March, this year, I was called to make an examination of little Wanda Lee Walker. I went to examine the girl to see if she had been injured in any way and found that she had not, no laceration or tear. I found the hymen had been previously ruptured. I made a smear, but I am not prepared to prove anything now. I don't want to answer, because I cannot prove what I found."

On cross-examination by Mr. Babb the doctor stated:

"I don't like to testify to what I found, because I cannot prove it. I told you I didn't want to testify if I could help it. By Mr. Babb. Q. Didn't I ask you if you found any evidence of this child being ravished, and you said, 'Hell, no'? A. I don't remember making that statement. I told you I didn't find any evidence of her being bruised. I told you I had talked all I wanted to about it, and that I didn't want to testify in the case."

The witness continued:

"As a result of my examination, I came to the conclusion that there were present from a smear that was taken, male sperms. Q. I believe you say you will state now positively that there were male sperms? A. I don't like to testify, because I don't have the smears now. I destroyed them when the case was apparently settled."

The witness further stated:

"When I made the examination of this child, there were no lacerations or bruises. There was no evidence of any recent penetration. There were no bruises, no redness or irritation that indicate recent penetration. I did not have to go inside to get the sperms in my investigation."

The state rests.

M. S. Cox, a witness for the defendant, stated:

"My name is M. S. Cox. I live in the Whitesboro community; have been living there 26 years. I know Riley Thomas. I know where his shop is located in Whitesboro. I have known Thomas six or eight years. I was in Whitesboro on the 29th day of March, 1938. I guess I was in his shop nearly an hour. It was the evening of the school election; and I noticed the clock, and it was five minutes until two; and I left and went to the schoolhouse. When I was there, the Baughman boy and some other kids came there. I don't know who they were; and Riley told them to get out. I would call him drunk. He could get around; but I would call him drunk."

On cross-examination he stated:

"I don't know anything about him having intercourse with this little Wanda Lee Walker."

Dan Wilcox, called as a witness on behalf of the defendant, stated:

"I live at Whitesboro, Le Flore county, Okla. I was living there on the 29th day of March, 1938. I was acquainted with this man Walker and his wife and children. I was in Whitesboro the 29th of March, that day they held the school election. I got there about one o'clock in the afternoon. I went to Riley Thomas' blacksmith shop and from there up to Thornton's store. I was in the blacksmith shop about an hour and a half, between an hour and a half, and two hours. I went down to Riley's shop about one o'clock. Mr. Cox was in there and a little boy, Mr. Baughman's little boy. Some other children came in while I was there. They played around there a little bit, and Mr. Thomas gave them some money. I don't know whether he gave them all money or not. They went out, and went to the store, and came back. The Baughman boy was there when I went there. He was there all the time I was there, except he went out and bought something and came back. He was away for a little bit. I was there all the time the Baughman boy was gone. I was not there when the defendant was arrested. I had left his shop and gone up to Mr. Thornton's store, got in a truck, and drove in beside the side of the shop; and they went in and arrested him, just as we drove up. From about one o'clock up to the time they arrested him, I was in his shop, except the time I went to the store, and got in the truck, and came back down at the time they arrested him. Mr. Boren arrested him. Mrs. Walker, the mother of the little girl, was with him."

On cross-examination the witness stated:

"I had dinner at home that day. We drove two miles. I live two miles from Whitesboro. I left home between twelve and one o'clock. We generally eat dinner around twelve o'clock; and they had a school election. I thought

they opened at one o'clock. Riley and I are good friends, so far as I know. The first place I went was to his shop. He was drinking. Wanda Lee Walker was there in the shop. During the time I was there, Riley was laying and sitting part of the time on his bunk. The children were playing around in the shop. There were two or three of them. I didn't see Wanda Lee Walker on Riley's bed during the time I was there."

Re-cross-examination: "The doors were not shut while I was there."

John Aikens, a witness for the defendant, stated:

"I know Riley Thomas and the Walker family. On the 29th of March, 1938, we had a school election. I went up there that morning about eleven o'clock. I was in Riley's shop. I was there before he was arrested. I was there about two hours or a little over before he was arrested. He was in the back-end of his shop. I think he was cooking his dinner. I never went in where he was. I was in front. I did not see any children. I went up to the schoolhouse about 1:30, when I left the shop. I stayed until they voted, and I came down to Mr. Boren's. I saw Mr. Cox in the shop. I did not see anything of the children. It was somewheres towards three o'clock, I guess, when Mr. Boren went down to the shop. It was after the election had opened up; and we had voted. I was one of the first to vote. I remained but a few minutes after I voted. I came on down behind Mr. Boren."

On cross-examination the witness stated:

"I never looked at my watch. I did not pay any particular attention to any children around there, four or five years old. I never noticed any children at all. I came on the outside of the shop, and talked to the other fellow. He wanted to vote; and we went on. It took us about five or ten minutes to walk from the shop out to the schoolhouse. I am not certain about what time I spent out at the schoolhouse."

Vernon Ray Baughman, a witness for the defendant, stated:

"My name is Vernon Baughman. I live at Whitesboro with my father and mother. I am 13 years old. I go to school. I am in the fourth grade. My teacher is Miss Dora Weaver. I know Riley Thomas; have know him about two and a half years. I remember when we had a school election down there. I was in my daddy's shop. Riley Thomas was running it. I went down to the shop that morning, but I don't know just what time, about the time for books to take up at school. I stayed at the shop until they took him off. I was inside the shop when Tom Boren took him off. I was there when Mr. Boren came. Dan Wilcox was there. At the time Mr. Boren came, me and Riley was there. The Walker lady came with Mr. Boren. I saw the little Walker girl there that day. They were just running around like they usually do. I left the shop, and went out about noon to Mr. Wilhite's store to get some Vienna sausage. I then went back down to the shop. It is about a block from Riley's shop to Mr. Wilhite's store. I left Dan Wilcox there when I left. When I returned, Dan Wilcox was still there. At no time while I was there did I see Riley Thomas take the little Walker girl and put her on the bed. I did not see him take her clothes off or anything out of the way."

Cross-examination:

"I am 13 years old. They did not have school that day, the reason that I did not go to school that morning. I do not remember seeing you (to the county attorney) down there looking about this case. I did not see you talking to my mother or father. My daddy owns the shop. I couldn't promise you about the time I went down that morning. It was about the time the school usually takes books up. The reason I went to get the sausage was that Riley wanted some for dinner. It was my father's shop; but Riley was running it himself. I ate dinner there with Riley. We had Bologna sausage and coffee and light bread. I fixed the dinner. I was gone from the shop just long enough to run a block and back. I do not remember

whether I was at home the day you talked to my daddy. What day was it? I went to school every day they had school there. If you were at my father's house on Friday after this happened on Tuesday, I was in school. Q. You tell the jury you stayed in that shop with Riley Thomas all day? A. Yes, sir."

The witness continued:

"Everybody knows I stayed there that day, my mamma and daddy. I guess I was gone about three minutes, something like that, when I went after the sausage. I just ran up there and back. Wanda Lee has a little sister. Riley Thomas gave the nickle to the least one; I don't know which it is. Riley told me to go up there and get some bologna. Just one of the girls went. Wanda Lee didn't go. She got some peanuts. Mrs. Walker came up there, and asked us two kids where the other girls were."

Mrs. Henry Baughman, a witness for the defendant, stated:

"I live at Whitesboro. I have lived there most of the time since 1908. I know Mrs. Walker, the mother of Wanda Lee. The day of the school election, they lived about one hundred yards from our residence. We have moved since the school election. I saw Mrs. Walker in the afternoon. She came to my house something like one-thirty,' and told me this tale about Mr. Thomas attacking her little girl; and of course, my knowing him, I never knew anything like that about him. Mrs. Walker wanted my advice. 'I hardly know what to tell you,' I said. I asked her if she knew that to be the truth; and she said, 'Yes, I looked through the crack. I didn't see this, but I got my little girl to tell me.' She didn't tell me where she looked through the crack. She said her little girl was in the shop. I told her if it was my little girl, I would telephone Bill McGuire. She said, 'I don't want to go to court. I don't want to cause him any trouble. I want them to go, and tell him to leave.' I went with her to see Mr. Boren. I wasn't right there when she talked to Mr. Boren. When I got back my children and her daughters were at my place. Wanda Lee was playing with the other children, swinging on a rope in the back yard,

and jumping on a chicken coop, like children will, bucking and playing. If she had been hurt or injured, I couldn't tell it from outside appearances. Mrs. Walker did not ask me about having an examination made."

Cross-examination:

"When Mrs. Walker came down she seemed to be considerably torn up, and wanted to ask my advice. I have known her but a short time. She knew that Mr. Riley was working for my husband. I went with her to the schoolhouse to see Mr. Boren. She wanted Mr. Boren to tell him to leave. I first told her I would call Bill McGuire, that was how I felt about it. I said that if that was my child, that was what I would do. She said, 'I don't want it to go to court.' I knew that Riley Thomas was a good friend of the Walkers. Mr. Boren sent for me to come and take over the shop. When I got there, Mr. Boren, Riley, and my little boy were there. The reason my boy did not go to school that morning was because there wasn't any school that day. My husband's name is Henry Baughman. I do not know whether he has been to the jail to see Riley or not. He is here today subpoenaed as a witness for the defense."

Mrs. Lula Walker, recalled by the defense for further cross-examination, stated:

"I am the same Mrs. Walker that was on the stand before noon. Immediately after Riley Thomas was arrested, I came to my daddy's, about five miles from there on the road from Whitesboro to Talihina. I took Wanda Lee with me. I called the doctor from my own house. The doctor came out to my house. He got there somewhere about eight o'clock. Wanda Lee is six years old the fourth day of May, this year."

Tom Boren, testifying for the defendant, stated:

"On the 29th day of March, 1938, I was constable at Whitesboro. Mrs. Walker came up to the schoolhouse, where they were voting. She asked me not to arrest him then, to tell him to go. She did not state why she wanted him to go. She said she would like for him to get out of

the country. If I remember the exact words she said, was, she asked me if I would do one thing. I asked her what it was; and she said to let her talk to him, and tell him to get out of the country. She was very much upset and excited. I talked to the little girl. She told me what happened. Justice of the Peace Judge Billy and I brought the defendant to jail. When I talked to the little girl she was between the shop and Mr. Baughman's house. She said 'Yes' once, and nodded her head the rest of the time. It was probably twenty minutes after the offense is alleged to have taken place."

Joe Ritter, testifying for the defendant, stated:

"I have lived at Whitesboro since 1932, running a blacksmith shop and a garage. I know Riley Thomas; have known him since 1934. Mr. Henry Baughman owns the shop that Riley Thomas was running. The door to the shop that Riley was running next to Ming's store is about three and a half feet or not quite that wide. There is another door in that west wall, located on the west side, just ten feet from the rear; also a door in the center of the south end; one window in the east wall, no doors. The partition does not extend the full width of the shop. There is about six feet between the end of the partition and the east wall. The door south of the bunk is fastened with a chain, hooks around a 2 by 6, opens to the outside on a 2 by 6. The 2 by 6 sets upright. Looking through the door, that rear door, you cannot even see the back-end of the mill. You couldn't stand on the outside and look through and see into the wall anywhere. You cannot go around to the back door without climbing over a wire fence. You cannot stand at the door next to Ming's store, and see back to where the wall is. You couldn't stand at the front door, and see the bunk of Riley's, not with the front doors open."

Cross-examination:

"I rent the mill that I run in this blacksmith shop. The shop belongs to Mr. Baughman, my father-in-law. Riley Thomas works in there. All I do there is run a mill and blacksmith shop; grind corn every Saturday. I know

that Mr. Baughman told you to investigate the case. You didn't have to leave me and Henry to go see anybody else. We were standing there in the door."

Hoy Smith stated:

"I live southeast of Talihina, and I know Riley Thomas. I am familiar with the different doors in that shop. I am acquainted with the back door on the west side. It swings to the right as you go in. There are two little holes; a chain about like that (indicating) runs through these holes and fastens on the inside. The door closes flush with the outside. On the inside, there is a 2 by 6. It fits well inside the width cross-wise, and makes it 6" from the door. Since this happened, I have gone to the door and looked in. You cannot see the wall looking through this hole, for the reason that the 2 by 6 keeps you from seeing through it, and besides the wall sets about three feet, which would be to the left, if you go in; and you couldn't see through it. You can see straight ahead, where the mill is located. The wall on the inside is lined with paper cardboard. You cannot stand on the outside and look through any crack, and see the mill. I was present in Talihina when you asked Dr. Reynolds some questions with reference to this case. By Mr. Babb: Q. I will ask you if I didn't ask this question, and he gave this answer, 'Did you find any evidence of this child being ravished?' and he said, 'Hell, no'? A. That's exactly what he said."

On cross-examination: "I live four miles southeast of Talihina, just about seven miles from Whitesboro. I was with Mr. Babb that day."

There are several pages of cross-examination of this witness; but the testimony is in substance the same as his direct examination.

Mrs. Verna Baughman was recalled.

"By Mr. Babb: Q. Did Mrs. Walker make any statement to you with reference to what she may do or threatened to do? A. Yes, she said, 'If you will tell me, I won't whip you' (referring to Wanda Lee), and she said she

looked through the crack; and she said she told her she saw it; but says, 'I didnt,' says, 'I didn't see anything.' "

Riley Thomas, the defendant, testifying in his own behalf, stated:

"My name is Riley Thomas. I am the defendant in this case. I am 42 years old. When I got in this trouble, I lived at Whitesboro, Okla. Before going to Whitesboro, I lived down on a farm between Talihina and Whitesboro. I have lived in and around Talihina 15 years. I am a blacksmith by occupation. On March 29, 1938, I was a blacksmith at Whitesboro in Henry Baughman's shop. I know the little Walker girl, Wanda Lee. I have known her a long time. They used to be neighbors to me when I lived down on the creek between Talihina and Whitesboro. They lived about a mile and a half of me. On the 29th day of March, 1938, I was there in the blacksmith shop that morning up until about 10 or 11 o'clock. I don't know what happened after that. A horse had pawed me on the back and shoulder; and it was giving me lots of trouble; in order to get rid of that headache, I was drinking whisky. I had taken several drinks of whisky that morning. I don't remember of the Walker children being there that day; but I guess they were, because they were there every day. They play in the back end of the shop, them and the little Baughman girl, and two or three more of them. I know the Baughman boy. Ray is what I call him. He came to the shop that morning, and was with me the last I remember. It was around 8:30 or 9 o'clock, as best I can remember, when he came to the shop. I do not remember a Mr. Cox or these other men coming to the shop. I do not remember Dan Wilcox being there. I have no recollection of Wanda Lee Walker being at the shop that day. I have known the family for about five years. I know Mrs. Walker's brother, Pete Edwards. I did not see Pete Edwards that morning, so far as I remember. He was there the day before, and was working on the road. I am a witness against Pete Edwards in two cases, charged with stealing a mare and colt in one, and of butchering my own hog."

On cross-examination the defendant was asked with reference to the cases against Pete Edwards, in which he was a witness, if he wasn't absent purposely in Texas. He stated:

"I left simply because I was a free man, and wanted to leave. I figured on coming back to prosecute him. On Tuesday the 29th day of March, 1938, it was about 10 or 10:30 that I lost consciousness. I didn't have a doctor to treat me for the injury, where the horse pawed me. I was drinking the whisky trying to numb the pain. I drink Cream of Kentucky. I do not remember of seeing Mr. Boren or Josiah Billy that day. I do not remember coming to the jail. I have no knowledge. I don't know where I was or what I did or anything about it. I got this pint of whisky the night before. I don't remember whether I gave Dan Wilcox a drink or not. The first recollection I had about 10 o'clock in the morning, is when I woke up here in jail."

The witness was asked several questions as to a conversation that took place between him and the county attorney as to the preliminary trial.

"I did not ask them not to take me back to Whitesboro, and did not ask that the case be not filed down at Whitesboro. Sheriff Kerbow was upbraiding me and raving about it being such a terrible, horrible crime; and if I taken it to a jury, I would get the electric chair sure; and if I had a preliminary hearing down at Whitesboro, they would mob me down there. He said: 'I am not going to take him back down there. I am going to take him right to McAlester and put him in there for safekeeping.' Sheriff Kerbow asked you if you was going to go down there that day; and you studied a little bit and looked at him, and said, 'Yes, I guess I can find time to go down there that day'; and something or other was said about having to try it down there; and he says, 'No, you can have the hearing up here.' You were talking to Kerbow, and not me. By Mr. Babb: I submit that that's going far afield. By the Court: Yes, let's not pursue that line of inquiry any farther."

Ed Paylan, testifying for the defendant, stated:

"I live between Talihina and Whitesboro; have lived there since 1907. I know the defendant Riley Thomas, and Mr. and Mrs. Walker, his wife. I know Wanda Lee, the little girl. I was in Whitesboro the day of the alleged offense from about one o'clock until six that evening. As we went to Whitesboro, I saw the little girl and other little girls near the Ming store; and I remarked, if that was my kid it would get run over. The alleged offense had not happened then. I saw the girl after it was alleged to have happened; and she and the other children were running around and playing."

Cross-examination: "I don't know what happened in the shop."

Ervin Vaught testified:

"I know the Walker family. I was in Whitesboro the day it was alleged the little girl was attacked. I saw the little girl after it was alleged that she was attacked. She was out between Thornton's store and where Mr. Walker lived. The first time I saw her, and some little girls and boys were playing around there, running around in the road. Us men were sitting there at the post office looking at them, and thinking about this."

Cross-examination:

"Q. You don't know what happened down there in that shop that day? A. No, I don't. I saw Riley Thomas one time that day. When I saw him, he was talking to Mr. Boren. I figured maybe he was intoxicated, liquored up, or something. He seemed to be making a few motions with his hands. There are three stores at Whitesboro."

The defendant rests.

Mrs. Lula Walker was called in rebuttal, and denied the statement testified to by Mrs. Baughman.

Vernon Ray Baughman was recalled in rebuttal on behalf of the defendant, and stated:

"I closed the blacksmith shop doors that morning. Riley had a headache, and wanted me to close them, and didn't want people to come in the shop. I remained in there after I closed the doors. I fastened them on the inside with a chain through a hole in the door. The door that leads out west by Mr. Ming's store was not closed. It was not already closed. The back door was open. I closed the front doors, and fastened them on the inside. I closed the one on the west wall next to Mr. Ming's store. I fastened it over a nail on the inside. I didn't fasten the back door. I closed two doors and left two open. I was in the shop all the time after closing the front doors and the side door. Wanda Lee was in there after I closed the front doors. She went out the back door. I closed the doors when Dan went in there. The reason I closed the doors was that Riley had a headache. Wanda Lee was not in there when I closed the front doors. She came in at the side door. She went out the side door. She did not go to the side door and open it when her mother called her. It was all ready open. She came in there, running around like she always did. She stayed in there a right smart of the time. I have stayed all day at that shop lots of times, when daddy was there. This day was the first day that I remember of being there all day since Riley began working at the shop. By the Court: Q. Were you there when Mrs. Walker came to the shop? A. No, sir. Q. What time did you leave the shop? A. When they took him off, Mr. Boren. Q. You were there when the officers came? A. Yes, sir. Q. Where was Riley when the officers came? A. In the building there. Q. What was he doing? A. Nothing, fixing to eat a grape fruit. Q. Was he up? A. Sitting on the side of the bed. Q. Had he been up during the day, walking around the greater part of the time? A. Yes, he had done some blacksmith work that morning. He lay around there that afternoon. He had a headache, and said for me to close the front doors. I talked with him from time to time that afternoon. He didn't seem to know what he was talking about. By Mr. Followell: Q. What did Riley say that makes you think he didn't know what he was doing? A. I forgot what it was. It was something he said, something, well something about a plow point.

He had sharpened a plough point, just a few minutes before I closed the doors. He got it sharpened all right."

J. H. Billy, justice of the peace, called in rebuttal, stated:

"I assisted in bringing the defendant to the county jail. The defendant was sober. The defendant gathered up his belongings, and left part of them there at Ming's store. He had a little clothing, and put that in the car that we were in. The defendant said, 'You have known me a long time, and you know I can make bond'; but I said, 'We had better go to Poteau.' By Mr. Babb: Q. Have you ever been convicted and served a term in the penitentiary? A. Yes, sir. On redirect examination: I was pardoned; have been postmaster and justice of the peace since that time."

Dr. Reynolds was recalled for further cross-examination, and asked if he had been an inmate of any institution for narcotic addicts; and he answered that he had been about a year ago.

On cross-examination he stated that he was a practicing physician at Talihina at that time.

The foregoing is the substance of the testimony introduced by the state and the defendant.

The defendant has assigned six errors alleged to have been committed by the court in the trial of his case:

1. That the verdict and judgment is not sustained by sufficient evidence and is contrary to law.

2. Error of the court in admitting over the objections and exceptions of the defendant at the time of incompetent, irrelevant, immaterial and prejudicial evidence.

3. Error of the court in admitting over the objections of the defendant the testimony of the witness, Wanda Lee Walker.

4. Error of the court in each of the numbered instructions to the jury.

5. Errors of law occurring at the trial and excepted to by the defendant at the time.

6. That the commission of the aforesaid errors and each of the same prevented and precluded the defendant herein from receiving a fair and impartial trial as required and provided by law.

This case is peculiar to the extent that the defendant had been living in Whitesboro, running a blacksmith shop, and the children of the Walker and other families had played in and around his shop. The day this alleged offense occurred was the day in which a school election was being held at the schoolhouse, a short distance from the blacksmith shop in which the defendant was working.

It seems inhuman and unreasonable that any one drunk or sober would have attempted to commit rape upon the prosecutrix in this case, who was only five years of age. It doesn't stand to reason that any sane man would attempt such an unthought of and unreasonable outrage upon this youthful child. A man, who willfully and intentionally would attempt to commit a crime of this kind, is unworthy to be permitted to reside in a civilized community, and should be banished from the society of the people in the community wherein he is permitted to reside.

It becomes necessary to consider the environment, during the morning and up until 1 or 2 o'clock in the afternoon, by which the defendant and the blacksmith shop were surrounded. Up to the time of this alleged offense, so far as the record in this case discloses, the defendant had borne a good reputation, and was laboring at his trade, blacksmithing, in a shop owned by Henry Baughman, a respectable citizen, living there in Whitesboro.

On the morning of this alleged offense and during the day, as the school election was to be held, they had no school at the schoolhouse. Vernon Baughman, 13 years of age and the son of the man who owned the blacksmith shop, as there was no school, went to the shop where the defendant was working. He was there until the afternoon of that day continuously.

The only testimony we have against the defendant was that of Wanda Lee Walker, who was five years old and had been accustomed together with other children to play in and around the shop of the defendant. On this day she was playing in and around the shop of the defendant. Sometime in the afternoon about 1 or 1:30 o'clock, the other children came out; and Mrs. Walker, the mother of Wanda Lee, claims that she went to the shop, and the doors were closed, and that she called to Wanda Lee, and Wanda Lee answered, and came out; but that before Wanda Lee came out, she looked through a small hole in the door where a chain passed through to fasten the doors, and that she saw Wanda Lee getting off of the defendant's bed, and that the defendant was laying on the bed, apparently asleep. This same Mrs. Walker told Mrs. Baughman, the wife of Henry Baughman, that she did not see anything; but told Wanda Lee so as to make Wanda Lee tell her what had taken place. The youthfulness of the child and her lack of understanding of words is such that the mother practically puts into the mouth of the child the fact that the defendant pulled her clothes off, and got on top of her. The mother also, when she got the girl out of the shop, went to the constable, and told him about it, and told him that she did not want this defendant arrested, but wanted the constable to go to him, and tell him to leave the town. In a few minutes the constable went down, he and the justice of the peace, and

took the defendant into custody, and took him to jail in Poteau.

The testimony of the prosecutrix is unintelligible, indefinite, and in fact cannot be considered competent, because of her youth and her lack of understanding of the language, and the force that was brought to bear upon her by her mother in threatening to whip her, if she did not tell, and in telling Wanda Lee that she saw what was going on.

The mother says that when she looked through the keyhole, Wanda Lee was getting off the bed, and had one suspender on and one suspender off.

On the other hand, the testimony of Dan Wilcox is that he went to the shop about noon or sometime before, and remained there until right at the hour of two o'clock. and that the children were playing around there at that time. Other witnesses testify to the same facts.

Vernon Baughman, the son of the man who owned the shop and who was 13 years of age, states positively that he went to the shop at 8 or 9 o'clock in the morning, and did not leave there until the defendant was arrested; that the children were playing around the shop. The witness further stated that the defendant complained of a headache; that he had been pawed by a horse, and complained of pain; that he drank some whisky to allay the pain. The witness further stated that just about noon or a little after, the only time he was out of the shop, he went up to the store to buy some Bologna sausage for the defendant and him to eat for their noon meal; that he had gone up to the store and back, and was gone only a few minutes. The other children came out of the shop; but Wanda Lee still remained in the shop playing. The witness further stated that the defendant was suffering so

that he did not want anybody to come in the front part of the shop, and asked him to close the front doors of the shop, which he did; that the other doors were not closed; and that the little girls went out the side door; and that there was no reason why anybody else should not come and go at will by the side or back doors; and that at no time, from early morning until he left after he had prepared dinner for the defendant and himself, were the side or back doors locked or fastened.

The other witnesses who were back and forth to the shop in substance corroborate the boy as to the condition of things. They stated that the defendant was drinking.

The prosecutrix could not answer any question intelligibly; and a great many of the questions and her answers and failures to answer in her testimony are set out in this opinion.

The defendant states that he was suffering from the injury, where the horse had pawed him, and was aching; that he drank some whisky; that the whisky he drank was Cream of Kentucky; and that sometime before noon, he became intoxicated, and from that time on he does not remember what took place until he roused up in the jail at Poteau, Okla.; that before he became intoxicated, the children were playing around the shop; and he told them to go on out, and advised the Baughman boy to shut the front doors so that there would not be anybody coming in and out, as he felt so badly.

Mr. Billy, a justice of the peace, stated the defendant, when he started with him to Poteau, seemed to be sober; gathered up a lot of his bundles; and that they took him on to jail.

Dr. Reynolds was called to testify to an examination he made of the child, the prosecuting witness. He stated

positively there was no indication of bruises or fresh lacerations. He stated that he had made slides of what he found on the child, but not on the inside of the vagina, that seemed to have been male sperm; but that he had lost his slides; and that he did not want to testify positively that it was male sperm.

In other words, the doctor's testimony is indefinite, uncertain, and unsatisfactory, and amounts to no positive proof of anything that would tend to show the intent of the defendant, or any action of the defendant left in the way of bruises or lacerations on the child or her body.

This court has never read more indefinite and uncertain testimony of a practicing physician than that of Dr. Reynolds in this case. Whether or not the doctor did not want to testify, and was an unwilling witness, or whether or not he had made sufficient examination to state definitely and positively facts that would be damaging to the defendant and beneficial to the state in this case, we do not undertake to say.

The defendant, in his testimony, states that he drank some whisky to allay the pain that he was having, caused by having been pawed by a horse; and that sometime before the noon hour on the day of the alleged offense, he became intoxicated; and that he does not remember anything that took place from that time until he woke up in the county jail at Poteau, Oklahoma. The state introduced no evidence to contradict the defendant as to his condition. Whether the statement as to his being intoxicated to such an extent that he did not remember anything be true or false, it stands uncontradicted.

The question to be determined in this case is: Is the evidence sufficient to sustain the judgment of an assault with intent to commit rape?

Intent is the gist of the offense. Every laying on of hands on a female under the age of consent, even though improper, does not necessarily imply an intent to have sexual intercourse. Indecent liberties may be taken with a child without any such intent. Our statutes recognize this in providing a penalty for taking indecent liberties with a female child without intent to commit rape. Section 1769, O. S. 1931, 21 Okla. St. Ann. § 22; West v. State, 27 Okla. Cr. 125, 225 P. 556.

The specific intent to commit rape is an essential element, both of intent to rape and of assault with intent to rape. An assault with intent to rape or attempt to commit rape includes every element of the crime to commit rape except the accomplishment. The felonious intent to commit rape is the essence of the offense. It is elementary, when a specific intent is required to make an act an offense, that the doing of the act does not raise the presumption that it was done with specific intent.

Intent, which is essential to support a conviction of an attempt to commit rape, cannot be presumed; but must be shown to exist by competent evidence and beyond a reasonable doubt.

In Teagarden v. State, 33 Okla. Cr. 394, 244 P. 63, 64, the court said:

"While it is not necessary in such cases that force should be used or resistance made, and that it is of no consequence that the female consents, the existence of a specific intent in the mind of defendant then and there to have carnal connection with the female is an essential element of the crime of assault with intent to commit rape."

In People v. Dowell, 136 Mich. 306, 99 N. W. 23, 24, it is stated:

"The intent is the gist of the offense, and every laying on of hands upon a female under the age of consent, even though improper, does not necessarily imply an intent to have sexual intercourse. Indecent liberties may be taken with a child without any such intent."

"In such cases the laying of hands upon the female and the intent to have intercourse with her must concur as to the time." 22 Cyc. page 1435; Kitchen v. State, 66 Okla. Cr. 423, 92 P. 2d 860; Ellis Hall v. State, 67 Okla. Cr. 330, 93 P. 2d 1107.

And see Wharton Criminal Law, 11th Ed., par. 215.

Specific intent may be inferred from acts; it may be shown like many other facts from surrounding circumstances; circumstantial evidence sometimes is very strong and yet falls short of proof sufficient to prove the corpus delicti.

All the circumstances must be consistent with the theory of the defendant's guilt. None of these circumstances must be inconsistent with his guilt. The circumstances when taken together must admit of no other reasonable hypothesis than that of guilty.

In this case, there has been no proof of the specific intent to commit the crime of rape, one essential element of the crime, except by very remote and uncertain presumption.

The proof of the state in this case falls far short of what is required to overcome the presumption of innocence that the defendant is entitled to throughout the trial.

The prosecutrix in this case being too young to understand what the consequences of falsely swearing would be; and her youth is such that it renders her testimony worthless, as far as establishing the facts necessary to be established to sustain a conviction of the defendant of the crime of assault with intent to commit rape.

On careful examination of the record and considering the proceedings of the trial, we are inclined to think that the defendant was prosecuted with unusual severity. It seemed to have been forgotten that the defendant was presumed to be innocent until convicted; and that the law of the land guarantees every one accused of crime, whether rich or poor, a fair and impartial trial. The safeguard erected by the Constitution and laws of our state are intended to protect the rights of all citizens alike; to protect the rights of the guilty as well as those of the innocent.

This court cannot give its sanction to the conviction of any person accused of crime, where the proceedings upon which the judgment is based show that the accused did not have that fair and impartial trial to which he was entitled under the law. No man should be convicted of a crime upon mere suspicion because he may have had an opportunity to commit it; and where circumstances are relied upon for a conviction, they ought to be of such a character as to negative every reasonable hypothesis, except that of the defendant's guilt.

For the reason that the evidence is insufficient to sustain the verdict and judgment, we are without doubt as to the propriety and necessity of reversing the judgment.

The judgment is therefore reversed and the case remanded to the district court of LeFlore county with directions to dismiss.

DOYLE, P. J., and BAREFOOT, J., concur.