## MATTHEWS v. STATE.

No. A-11210.   May 3, 1950.

(218 P. 2d 393.)

Harry Seaton, Public Defender, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for plaintiff in error.

POWELL, J.   The defendant, Dero Matthews, was charged by information filed in the district court of Tulsa county with the crime of attempted first degree rape, second offense.   He was tried before a jury on October 1, 1948, found guilty of the charge, and his punishment assessed at 60 years in the State Penitentiary.

Appeal has been perfected to this court.   Counsel for defendant argues that there was not sufficient evidence to convict the defendant of the charge, but that the evidence was only sufficient to convict him of the lesser and included offense of sexual abuse of a female child, second offense.

It was stipulated by and between the attorney for the defendant and the attorneys for the state prior to trial, and on June 10, 1948, that on September 22, 1947, the defendant was convicted in the district court of Oklahoma county of unlawfully abusing a female child, sexually, and was in that case sentenced to serve a term of one year in the State Penitentiary at McAlester.

The victim of this case was a young girl, Juanita Louise Druge.   The act was alleged to have occurred on Sunday, the 25th day of April, 1948.   We regret the necessity for reciting the evidence, but the nature of the charge, the evidence itself, and the severity of the pun-

ishment require the most careful consideration. The child testified that at the time of the tragedy she was living with her mother on Main street, Tulsa; that she was riding around on her scooter and that down at the corner at the Rexall Drug Store, which was on the block across the street from her grandmother's home, the defendant accosted her, asked her name, the grade she was in, and what church she attended, and told her that he wanted to show her something; that she told the man she wanted to play and prepared to go, and he stated to her that he also wanted to play; that she started around the block on her scooter and he started around the other way, and that they next met in the middle of the block; that defendant pointed out some church steps by the side leading off the street; that she and defendant sat down on the steps side by side; that it was about 5 o'clock in the afternoon; that defendant took his privates out; that she saw them; that he tried to put his privates in her, though she stated that he did not pull her over on him or get on her, and she did not state how he managed this. She stated that it started to sprinkle rain; she got up and ran down the steps and went across the street to her grandmother's, left her scooter, and got her raincoat and started to go to her mother's place and it had stopped sprinkling and the defendant was on the porch of a vacant house across the street from her grandmother's and that the defendant beckoned for her to come over and she did, and he showed her an open window and wanted her to get in; that she attempted to duck under his arms and get away but he put her through the window, took her hand and led her in the kitchen and made her lie down on the floor, and that he got on top of her and put his private parts inside hers, but at first did not take off her panties, but did after a while; that it hurt when he put his weight on her, but did not hurt

her much when he put his private parts in her; "that after a while he wondered why something was not working, or something, and went to the bathroom." She went with him and they came back downstairs and he again laid down on top of her; that she felt something against her private parts and that he put his private parts inside hers. That she then after a time told the defendant that she wanted to get up and go see what time it was, and he asked her to come back if it was not time for her to go. On cross-examination she stated that she had never seen a man's private parts prior to that day, and that they looked "long and hairy." She testified that she did not understand what an erection was.

On re-direct examination witness identified a dress, rain coat and panties as those worn by her at the time of the acts of defendant related, and that the dirt and black marks got on them on account of the dirty floor defendant laid her on.

Dr. Monty V. Stanley testified that he was a physician, and that on the evening of April 25, 1948, at 6:15, he examined Juanita Louise Druge at the city jail at the request of the policewoman on the Morals Squad. He testified, in part, as follows:

"Q. State what your examination consisted of and what it shows? A. I examined the girl vaginally. That is, externally, and I found an area of redness on the inner left lip of the vagina. Q. The left lip of the vagina? A. Yes, sir, in the left upper portion. Q. You could not determine, could you, what caused that redness? A. No, sir. Q. Did that indicate to you something or another had been rubbed up against that particular portion of the little girl's anatomy? A. It could have been due to concentrated urine or it could have been a skin infection. Q. Could it also have been caused by a man's penis being rubbed up against there? A. Yes, sir."

On cross-examination he testified, in part:

"Q. From your examination, did the examination disclose whether there had been a penetration or not? A. There was no penetration. Q. This redness you saw there, might that not be caused by her clothing rubbing against her private parts? A. I doubt the clothing could have caused it. Q. Could they have caused it? A. Unless the clothes got underneath there. Q. I don't know what it shows, but I am inquiring whether or not it could have been caused from clothes. * * * A. Yes, sir. Q. And a number of other things? A. Yes, sir. Q. From your examination you could not determine what the cause of it was? A. No, sir."

Mrs. Florence Druge testified that she was the mother of Juanita Louise Druge; that on Sunday, April 25, 1948, they lived at the Longfellow Apartments, 1019 South Main, Tulsa, that the Rexall Drug Store was about one-half a block distant; that the child's grandmother lived in the Tulsa Apartments, 9 West Ninth; that at about 6 o'clock in the afternoon of the day in question her daughter came in their apartment and she noticed that her raincoat was quite dirty and that when her daughter took it off, she noticed that her dress was also dirty; that she questioned her as to the cause and was told by her that a man took her in the house where the Crows formerly lived, which was right across the street from 9 West Ninth; that witness immediately took the child and began a search for the man; that she went up to the old house and then started back home and just as they got across the street from the apartment, her child said: "That is the man." She then identified the defendant as being the man pointed out by her daughter. The mother stopped the defendant and asked him whether he accosted her daughter and he said that he only spoke to her. She further testified that some of her neighbors talked with defendant until she got the police; that she thereafter went

to the police station to have the child examined by Dr. Stanley.

Ray Page testified that he was a member of the Tulsa Police Department and that on April 25, 1948, he, after call, arrested the defendant at the corner of Eleventh and Main, Tulsa.

There was evidence that defendant was discharged from the penitentiary at McAlester three days prior to the date of the acts charged in the within case.

The court then recited to the jury the stipulation of the state and the defendant, theretofore entered into, concerning the previous conviction of the defendant of unlawfully abusing a female child sexually.

The defendant did not testify, and offered no evidence.

Counsel for defendant sums up his argument as follows:

"Under the law as we understand it, where, as in this case, the man had every opportunity that there was to carnally know the prosecutrix, but did not, that this does not constitute either attempted first degree rape or assault with intent to commit rape. The most it could be, and we say very frankly that in our opinion the jury might well have found that the defendant was guilty of sexual abuse of a female child."

Counsel, among other cases, cites the case of Teagarden v. State, 33 Okla. Cr. 394, 244 P. 63, second syllabus:

"Existence of specific intent to have carnal knowledge is essential to the offense of assault with intent to commit rape, and it is the province of the jury to determine whether it existed in defendant's mind when he committed the assault."

We approve the principle of law announced in the case cited.

Here it was necessary to establish intent to rape and an actual effort to carry that purpose into execution, and it was necessary to establish these elements beyond a reasonable doubt. Thomas v. State, 68 Okla. Cr. 1, 95 P. 2d 658; Temple v. State, 71 Okla. Cr. 301, 111 P. 2d 524. In the Thomas case this court recognized that every laying on of hands upon a female under the age of consent, even though improper, does not necessarily imply an intent to have sexual intercourse, and that indecent liberties may be taken with a child without any such intent. But the establishment of the necessary element oftentimes must be gathered solely from accused's conduct, the age of the female, time and place of the assault, and other circumstances attendant upon the occurrence. As stated in Brown v. State, 121 Ala. 9, 25 So. 744, and approved in State v. Owens, 26 N.D. 329, 144 N.W 439:

"It is seldom that a case can be found where the court can, as a matter of law, determine from the evidence that the intent to ravish did or did not exist. Where the intent rests in inference to be deduced from the facts proven, its existence or nonexistence must be submitted to the jury for their determination."

In the within case, while the testimony of the child that the defendant "put his private parts in my private parts" might ordinarily imply that there was penetration of the vagina on past the hymen, there is not sufficient evidence in this case to so conclude, because the examining physician testified that there was "no penetration." And it is evident that he meant no penetration of the vagina proper. He did not testify as to whether there was a hymen or not, and he stated that he did not make he found an area of redness on the inner left lip of the an examination internally. He did testify, however, that

vagnia, the evidence not being too definite whether labium majus or labium minus, though by the term "inner left lip" we conclude that he meant labium minus. But at all events, this constituted evidence sufficient for the consideration of the jury in corroboration of the testimony of the victim that she felt defendant's privates pressing against hers and that he put his privates inside hers. See "Legal Anatomy and Surgery" by Malloy, p. 656 (Callighan & Co.), and "Legal Medicine and Toxicology", by Emerson, chapter on Rape (D. Appleton & Co.). If the jury believed this evidence intent necessarily was to be implied.

Of importance in the jury's determination, was the evidence that the examination was made but a few minutes after the alleged act, the soiled garments corroborating the child's testimony that the defendant placed her on the floor of the old house, the admission of the defendant that he had spoken to the child, and his being located in the vicinity of the old house only a few minutes after the alleged act. This evidence, together with the other circumstances recited, constituted sufficient evidence for submission of the case to the jury.

The argument of counsel that the fact that defendant did not force entrance to the vagina proper when he might have, disproves intent on defendant's part to rape, and that at most demonstrates that he could be guilty only of the lesser crime of sexual abuse of a female child, is not sound, because under the law in this state, one may be guilty of the crime of rape by penetrating the outer part of the female organ and without rupture of the hymen. By statute, Tit. 21 O.S. 1941 § 1113, any penetration, however slight, is sufficient to constitute the crime of rape. Swearingen v. State, 31 Okla. Cr. 66, 237

P. 135; Hancock v. State, 90 Okla. Cr. 69, 210 P. 2d 372; State v. Pollock, 57 Ariz. 415, 114 P. 2d 249.

Such being the law in this jurisdiction it matters not that the defendant refrained from further penetration. Intent may be implied as a matter of law, where there is the slightest penetration. Defendant may have desisted not from any consideration of the child's welfare, or change of heart, but fearing the pain might cause the child to cry out and lead to discovery, or this method may have been the most satisfactory to him. The books are full of case histories of perverts who gain sexual satisfaction in ways anything but orthodox with normal people. But at all events, the fact of incomplete penetration is of no significance, the evidence being such, if believed, to show penetration sufficient under the statute. The defendant, of course, might have been charged with the crime of rape. The county attorney saw fit to file the lesser charge, feeling, no doubt, that under the evidence he stood a better chance of obtaining a conviction. This decision was within his discretion, and he apparently acted wisely. Wilson v. State, 89 Okla. Cr. 421, 209 P. 2d 512.

The evidence in this case, therefore, was sufficient for submission of the case to the jury, and the jury decided the issues against the defendant.

We have examined the instructions, which include one covering the contention of counsel for defendant as to the question of the lesser offense of sexual abuse of a female child, and we find nothing in the record to justify this court in reversing the case, or modifying the verdict and judgment entered.

The case is affirmed.

JONES, P. J., and BRETT, J., concur.